**Joe PUTNAM and Irving Taxpayers Opposed to Illegal and Wasteful Use of Tax Money, Appellants,**

**v.**

**CITY OF IRVING, Texas, Appellee.**

**No. 05–10–01269–CV.**

Court of Appeals of Texas, Dallas.

Jan. 27, 2011.

James B. Harris, Scott P. Stolley, Richard B. Phillips, Thompson & Knight, L.L.P., Christopher L. Chauvin, Dallas, TX, for Appellants.

Mikel J. Bowers, Bell, Nunnally & Martin LLP, Michael L. Raiff, E. Ray Hutchison, Thomas S. Leatherbury, Vinson & Elkins, L.L.P., Dallas, TX, Charles R. Anderson, Office of City of Irving, Lisa Bowlin Hobbs, Vinson & Elkins, L.L.P., Irving, TX, Marc A. Fuller, Dallas, TX, John F. Boyle, Boyle & Lowery, L.L.P., Irving, TX, Robert D. Martinez, Cotton Schmidt & Abbott, LLP, Fort Worth, TX, Frank L. Branson, Eric T. Stahl, Law Offices of Frank L. Branson, P.C., Dallas, TX, Karen Bailey Pettigrew, Assistant Attorney General Financial Litigation Division, Austin, TX, for Appellee.

Before Justices O'NEILL, FITZGERALD, and LANG–MIERS.

## OPINION

Opinion By Justice LANG–MIERS.

We deny appellants' motion for rehearing and motion for rehearing en banc. On the Court's own motion, we withdraw our opinion of December 13, 2010 and vacate the judgment of that date. This is now the opinion of the Court.

This is an expedited appeal under a statute that applies to the issuance of public securities. *See* TEX. GOV'T CODE ANN. §§ 1205.001–.152 (West 2000). The City of Irving, Texas, sought a declaratory judgment to validate the issuance of municipal bonds for the construction of an entertainment center and hotel complex and the pledge of certain revenues to repay the bond debt. Joe Putnam, a former mayor of Irving, and Irving Taxpayers Opposed to Illegal and Wasteful Use of Tax Money, a group of taxpayers opposed to the issuance of the bonds and the pledge of the revenues, (together the Taxpayers) intervened in the action. The trial court ordered the Taxpayers to post security to

continue their participation in the proceeding. When they did not post security by the statutory deadline, the trial court dismissed their intervention. Because we conclude that the trial court did not abuse its discretion by requiring the Taxpayers to post security or by dismissing their intervention, we affirm the trial court's orders.

## BACKGROUND

The City designed a new convention center and entertainment complex to attract visitors to the City. In 2007, the City held an election asking voters to vote for or against the construction of the entertainment center and the imposition of new taxes. Voters passed the measure and approved the imposition of three new taxes: an event admissions tax, a 2% hotel occupancy tax, and a vehicle parking tax. *See* TEX. LOC. GOV'T CODE ANN. §§ 334.151, .252 (West 2005) (admissions tax and hotel occupancy tax), § 334.201 (West Supp. 2010) (event parking tax). The City passed ordinances imposing the event admissions tax and parking tax at a special meeting of the city council.

The new convention center has been built and is set to open in early 2011. The City filed this declaratory judgment action under chapter 1205 of the Texas Government Code to validate three series of municipal bonds in a total amount not to exceed $200 million to fund the construction of an "entertainment center and boutique hotel project." *See* GOV'T § 1205.021. It proposed to pledge the following revenue sources to repay the bond debt: (1) state sales and use taxes, mixed beverage taxes, and hotel occupancy taxes collected within the project; (2) city sales and use taxes and mixed beverage taxes collected within the project; (3) a 7% citywide hotel occupancy tax; (4) rent payments from its tenant at the project; (5) the parking tax on motor vehicles parked at the project; (6) the admissions tax on events held at the project, and (7) the citywide 2% hotel occupancy tax.

The Taxpayers opposed the issuance of the bonds for several reasons. First, they contended that the City cannot legally pledge the State's portion of the revenue sources because the project does not qualify as a "hotel project." Next, they contended that the City cannot legally pledge the State's portion of the mixed beverage taxes because there is no statutory authority for this. Next, they contended that the City cannot legally pledge the admissions and parking taxes because those taxes were imposed by ordinances that were passed at a special meeting instead of a regular meeting as required by the city charter. Finally, they contended that the City cannot legally pledge any revenue sources other than those approved by the voters.

The City moved to require the Taxpayers to post security for any damage or cost the City may incur because of the delay caused by the Taxpayers' participation in the lawsuit if the City finally prevailed and obtained "substantially the judgment requested in its petition." *Id.* § 1205.101. The trial court held a hearing on the motion and agreed with the City. It ordered the Taxpayers to post security in the amount of $10 million within 11 days from the date of the order. When the Taxpayers did not do so, the trial court dismissed their intervention. *See id.* §§ 1205.103, .104(a). The Taxpayers appeal both the requirement of security and the dismissal. We consolidated the two appeals.

## DISCUSSION

### Standard in the Trial Court

 A trial court "shall" grant a municipality's motion to require security unless the opposing party establishes that it

is entitled to a temporary injunction against the issuance of the bonds. *See id.* § 1205.102. A temporary injunction is an extraordinary remedy and generally requires the party seeking a temporary injunction to show (1) a cause of action; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *See Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex.2002); *Alliance Royalties, LLC v. Boothe,* 313 S.W.3d 493, 496 (Tex.App.-Dallas 2010, no pet.). In this type of case, "the mere existence of the suit acts as a temporary injunction" because the bonds cannot issue while this action is pending. *Buckholts Indep. Sch. Dist. v. Glaser,* 632 S.W.2d 146, 149 (Tex.1982). The legislature's purpose in enacting this statute "was to stop 'the age old practice allowing one disgruntled taxpayer to stop the entire bond issue by simply filing suit.' " *Id.*

If the trial court grants the issuer's motion for security, the court must set the bond in an amount sufficient to cover any damages or costs the issuer may incur because of the delay caused by the continued participation of the opposing party or intervenor "if the issuer finally prevails and obtains substantially the judgment requested in the petition." Gov't § 1205.103(b). When a trial court orders a party to post security to continue its participation in a bond validation proceeding, the party must post the security before the 11th day after the entry of the order setting the bond amount. *Id.* § 1205.104(a). If that party does not post the required security by the deadline, the trial court "shall dismiss [that] opposing party or intervenor...." *Id.*

### Standard of Review

The statute required the trial court to grant the City's motion for security unless the Taxpayers established that they were entitled to a temporary injunction against the issuance of the bonds. Consequently, the issue here is whether the trial court abused its discretion when it determined that the Taxpayers did not meet their burden to show they were entitled to a temporary injunction against the issuance of the bonds. *See Boothe,* 313 S.W.3d at 496; *Tom James of Dallas, Inc. v. Cobb,* 109 S.W.3d 877, 883 (Tex.App.-Dallas 2003, no pet.); *In re Talco–Bogata Consol. Indep. Sch. Dist. Bond Election,* 994 S.W.2d 343, 345 (Tex.App.-Texarkana 1999, no pet.). In our review, we do not substitute our judgment for that of the trial court. *Cobb,* 109 S.W.3d at 883. We determine only whether the court's action was so arbitrary as to exceed the bounds of reasonable disagreement. *Boothe,* 313 S.W.3d at 496; *Cobb,* 109 S.W.3d at 883; *Talco–Bogata,* 994 S.W.2d at 345. In so doing, we draw all legitimate inferences from the evidence in the light most favorable to the trial court's decision. *Cobb,* 109 S.W.3d at 883. When the trial court bases its decision on conflicting evidence, there is no abuse of discretion. *Id.; Talco–Bogata,* 994 S.W.2d at 345. The trial court abuses its discretion, however, when it misapplies the law to established facts or when the evidence does not reasonably support the trial court's decision. *Cobb,* 109 S.W.3d at 883. We review de novo the trial court's legal conclusions. *See Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992). Additionally, this proceeding is governed by statute, and we review de novo matters of statutory construction. *F.F.P. Operating Partners, L.P. v. Duenez,* 237 S.W.3d 680, 683 (Tex.2007).

### Elements of a Temporary Injunction

#### Did the Taxpayers establish they have a cause of action?

The party seeking a temporary injunction must first establish it has a

cause of action. The government code states that all residents, property owners, and taxpayers of the governmental entity seeking to issue the securities are parties to the proceeding. *See* Gov't §§ 1205.041, .044. The City contends that the Taxpayers did not establish a cause of action because they presented no evidence that any of the Taxpayers reside in the City. We agree that Irving Taxpayers Opposed to Illegal Use and Waste of Tax Money did not establish that any of its members are residents, property owners, or taxpayers. However, the crux of the testimony showed that Putnam is a citizen of Irving. Although "citizen" is not expressly included within the statute, it is used interchangeably with "resident" in the local-government context. *See Nunez v. Autry,* 884 S.W.2d 199, 202 (Tex.App.-Austin 1994, no writ). As a result, we conclude that the trial court could have reasonably determined that the Taxpayers established that Putnam is a resident and is considered by statute to be a party to the proceeding.

### Did the Taxpayers establish a probable right to the relief sought?

The second element of a temporary injunction requires the party to establish a probable right to the relief sought. The Taxpayers argue four reasons why they established they were entitled to a temporary injunction to prevent issuance of the bonds. We address each in turn in the context of the appropriate standard of review.

### (1) Is the entertainment center project a "hotel project"?

■ Section 351.102 of the tax code authorizes a refund to a municipality of the state's portion of sales and use taxes and hotel occupancy taxes generated at a qualifying "hotel project" and also authorizes a

municipality to pledge those taxes to repay bond debt:

> (b) An eligible central municipality . . . may pledge the revenue derived from the tax imposed under this chapter from a **hotel project** that is owned by . . . the municipality . . . and that is located within 1,000 feet of a convention center facility owned by the municipality for the payment of bonds or other obligations issued or incurred to acquire, lease, construct and equip the hotel and any facilities ancillary to the hotel, including convention center entertainment-related facilities, . . . within 1,000 feet of the hotel or convention center facility. . . .

> . . .

> (c) A municipality to which Subsection (b) applies is entitled to receive all funds from a [hotel] project . . . that an owner of a project may receive under Section 151.429(h) of this code, or Section 2303.5055, Government Code, and may pledge the funds for the payment of obligations issued under this section.

Tex. Tax Code Ann. § 351.102(b), (c) (West Supp.2010) (emphasis added); *see id.* § 151.429(h) (stating "owner of a qualified hotel project shall receive a rebate, refund, or payment of 100 percent of the sales and use taxes . . . and 100 percent of the hotel occupancy taxes. . . .").

The Taxpayers contend that the City may not pledge the State's portion of the hotel occupancy taxes and sales and use taxes generated at the project to repay its bond obligations because the project does not qualify as a "hotel project" under the tax code. They contend that the hotel is a sham and is "nothing more than 'glorified backstage boxes' that serve as an amenity for those planning to attend an event at the performance hall." They contend that the entertainment center was never in-

tended to include a "hotel project," the voters did not approve it, and the non-hotel portions are not ancillary to the hotel nor within 1,000 feet of the hotel as required by statute.

The statute does not define "hotel project," but states that "hotel" has the meaning assigned by section 156.001 of the tax code. *Id.* § 351.001(4). And section 156.001 defines "hotel" as "a building in which members of the public obtain sleeping accommodations for consideration. The term includes a hotel, motel, tourist home, tourist house, tourist court, lodging house, inn, rooming house, or bed and breakfast." *Id.* § 156.001.

The City presented evidence that the hotel consists of 12 large luxury suites located at the back of the stage in the performance hall and will rent for about $2,000 to $5,000 per night. The hotel will have a lobby, a registration desk, and 34 meeting suites. Each hotel suite will have a den, bedroom, and bath; will accommodate 25 people in a social setting; and will sleep 6. The meeting suites are available to rent to small groups. The City also presented a letter from the State comptroller stating that the "entire Entertainment and Hotel Project ... qualifies as a 'hotel project'" and that the City may obtain a refund of state sales and use and hotel occupancy taxes pursuant to the tax code.

The Taxpayers presented expert testimony from Ajay Kothari, a hotel developer, who testified that in his opinion the hotel does not qualify as a "hotel project" because it does not have the minimum number of hotel rooms required by city ordinance; the common areas occupy more space than is typical for a hotel; the pool is too large for the maximum number of hotel guests; the hotel does not have "back of house office spaces" for the general manager and sales director; it does not have a laundry area; it does not have an employee lounge, fitness center, or business center; it will not be open year-round; and the rooms cost from $1,500 to $3,000 per night. He concluded that the "target audience" for the hotel rooms would be people attending an event at the performance hall. On cross-examination, Kothari agreed that the hotel will offer overnight sleeping accommodations. He also testified that he has no reason to believe the hotel rooms will not be offered to the public. He was not familiar with the definition of "hotel" in the tax code and stated that, in his opinion, a bed and breakfast with only five or six rooms is not a "hotel."

We conclude that the hotel meets the definition of "hotel" in section 156.001 of the tax code.

The Taxpayers also argue that the hotel does not qualify as a "hotel project" because it is not within 1,000 feet of the convention center and the non-hotel facilities are not "ancillary" to the hotel or within 1,000 feet of the hotel as required by the tax code. The City's Director of Real Estate and Development, Brenda McDonald, testified that the "hotel and hotel entertainment project" will be constructed within 1,000 feet of the convention center and "[i]n fact, it touches. It's adjacent to it." She said the convention center is physically connected to the entertainment and hotel project by a walkway. On cross-examination, the Taxpayers questioned how McDonald arrived at the measurement. She testified that she thought the measurement began at the southeast corner of the convention center and ended at the midpoint of the entertainment center. She admitted that the measurement from the main entrance of the convention center to the performance hall was more than a thousand feet. Kothari testified on cross-examination that the hotel was "a good 300 to 400 yards, probably more" from the

convention center. But he did not testify about which measuring points he used to arrive at his estimate.

The Taxpayers did not present evidence of how the 1,000 feet should be measured, such as from property line to property line, from main entrance door to main entrance door, or some other measurement. The drawings of the entertainment center, hotel, and new convention center, however, show that the facilities are one major complex. And even if we interpret the evidence concerning the distance between the hotel and convention center as conflicting, a trial court does not abuse its discretion when it bases its decision on conflicting evidence. *Cobb*, 109 S.W.3d at 883; *Talco–Bogata*, 994 S.W.2d at 345.

The Taxpayers next contend that the hotel is not a "hotel project" because the non-hotel facilities are not ancillary to the hotel. Although the statute does not define "ancillary to the hotel," it states examples of facilities that are "ancillary": "[C]onvention center entertainment-related facilities, restaurants, shops, and parking facilities within 1,000 feet of the hotel or convention center facility." Tax § 351.102(b). The commonly understood meaning of "ancillary" is "subordinate, subsidiary." Webster's Third New International Dictionary 80 (1981). It also means "supplemental." Black's Law Dictionary 95 (8th ed.1999).

Kothari testified that in the hotel business "ancillary" means a "physical connection to the facility which would be primarily benefit [sic] the hotel guests; and … the facility which is considered ancillary would derive [the] majority of its income from the hotel guests." He estimated that the 12 rooms would support a total occupancy rate of 32, less than 6 per suite, and that 32 people could not support 11 restaurants. Although he testified on cross-examination that these non-hotel facilities

will be used by hotel guests, he concluded the non-hotel facilities are not "ancillary" to the hotel because they are not connected to the hotel rooms, do not serve primarily hotel guests, and do not derive a majority of their revenue from the hotel guests.

But the Taxpayers do not cite any legal authority to support this argument, and the statute does not require that the facilities be physically connected to the hotel or that the restaurants must derive the majority of their revenue from the hotel guests to be considered ancillary. *See* Tax § 351.102(b). The types of facilities that the evidence showed would be included in the project—restaurants, performance hall, outdoor stages, outdoor plaza, and parking facilities—are the types of facilities expressly included in the statute as examples of facilities "ancillary to [a] hotel." *See id.* As we have noted before, the design drawings show that the convention center, entertainment center, hotel, parking facilities, restaurants, and stages appear to be one large complex. Based on the commonly understood definition of "ancillary" and the examples included within the statute, we conclude that the Taxpayers did not establish that the non-hotel facilities are not ancillary to the hotel.

In summary, we conclude that the trial court did not abuse its discretion by determining that the project is a "hotel project," and that the Taxpayers were not entitled to a temporary injunction on this basis.

**(2) May the City pledge the State's portion of the mixed beverage taxes?**

Another source of revenue the City proposes to pledge to repay the bond debt is a refund of the State's portion of the mixed beverage taxes collected within the project. The City relies on section 2303.5055 of the government code for this revenue source:

(a) For a period that may not exceed 10 years, a governmental body, including a municipality, county, or political subdivision, may agree to rebate, refund, or pay eligible taxable proceeds to the owner of a qualified hotel project at which the eligible taxable proceeds were generated.

. . .

(e) In this section, "eligible taxable proceeds" means taxable proceeds generated, paid, or collected by a qualified hotel project . . . including hotel occupancy taxes, ad valorem taxes, sales and use taxes, and mixed beverage taxes.

Gov't § 2303.5055(a), (e).

The Taxpayers argue that "governmental body" refers to local governmental entities only and does not authorize the State to refund its portion of the mixed beverage taxes to the City. The City argues that the definition of "governmental body" is unambiguous and would always include the State. Both sides cite authority for their interpretation of "governmental body."

The Taxpayers also rely on a statement made by the attorney for the State comptroller during the hearing that this statute does not give the comptroller authority to refund the State's portion of the mixed beverage taxes to the City. The Taxpayers contend this statement by counsel for the State comptroller constituted a "judicial admission." But even if this was a judicial admission, and even if "governmental body" excludes the State and, as a result, precludes the State from refunding its portion of the mixed beverage taxes collected from the project, the Taxpayers do not cite to any evidence in the record showing how much revenue is implicated by the loss of this revenue source or demonstrating the amount of revenue this accounts for out of the total revenue from all other sources. Accordingly, we cannot conclude that the trial court abused its discretion by determining that the Taxpayers failed to establish they were entitled to a temporary injunction on this basis.

**(3) Are the admissions and parking taxes void?**

■ The Taxpayers next contend that the City cannot legally pledge the admissions and parking taxes because the City passed the ordinances imposing these taxes at a special meeting instead of a regular meeting as required by the City's charter:

Each proposed ordinance or resolution shall be introduced in written or printed form and shall not contain more than one subject which shall be clearly expressed in the title, except ordinances or resolutions making appropriations or authorizing the contracting of indebtedness of bonds or other evidence of indebtedness. No ordinance, unless it be declared an emergency measure, shall ever be passed at a called meeting, but may be passed at any regular meeting of the council unless otherwise provided. All resolutions or orders may be passed at any regular meeting or may be passed at any special or called meeting called for that purpose.

IRVING, TEX., CITY CHARTER art. IV, § 17 (1952).

The City argues that the charter allows an ordinance to be passed at a special meeting. It cites testimony from the City's attorney that an "order" is the same as an "ordinance." The attorney testified that the city council "basically acts through a Resolution or an ordinance" and that an "order" is a shorthand reference for ordinance. He also testified that the City passed ordinances at special meetings when Putnam was mayor.

■ The interpretation of municipal laws and ordinances is a question of law

and we are not bound by the City's interpretation. *See Citizens Active in San Antonio v. Bd. of Adjustment*, 649 S.W.2d 804, 806 (Tex.App.-San Antonio 1983, no writ). We try to construe all terms to have meaning, however, and construing "orders" and "ordinances" to mean the same thing would render meaningless the use of the word "order" in article IV, section 17 of the City's charter. *See Hammond v. City of Dallas*, 712 S.W.2d 496, 498 (Tex.1986) (stating that reviewing court must construe city charter by reading it as whole and harmonizing its provisions, giving effect to every word, phrase, and expression as if each had been chosen deliberately).

The City argues that it may "re-authorize these taxes at the next regular meeting." The Taxpayers have not presented any reason why the City cannot pass new ordinances at the next regular meeting to eliminate any concern that the taxes were not properly imposed. Consequently, we conclude that the trial court did not abuse its discretion by concluding that the Taxpayers failed to establish they were entitled to a temporary injunction on this basis.

### (4) Does the pledge of additional revenue sources violate a contract with the voters?

■ Three of the seven revenue sources the City proposes to pledge were approved by the voters in the election. The remaining four revenue sources were already existing taxes being pledged to repay the bonds issued to fund the project. The Taxpayers contend that the City's proposed pledge of the other four revenue sources violates its contract with the voters to use only the three revenue sources passed in the election.

■ A city violates its "contract" with voters if it uses proceeds from taxes approved by the voters in a way that the voters did not approve. *See Taxpayers for Sensible Priorities v. City of Dallas*, 79 S.W.3d 670, 676 (Tex.App.-Dallas 2002, pet. denied). Here, the ballot proposition contained in the appellate record asked whether voters were for or against the construction of the project and the imposition of three new taxes. It did not state that the project would be funded using only the three new taxes. The voters passed the measure. The City's proposal to pledge the new taxes to fund the project is consistent with the voters' approval. We conclude that the trial court did not abuse its discretion by determining that the Taxpayers failed to show they were entitled to a temporary injunction on this basis.

In summary, we conclude that the trial court did not abuse its discretion by determining that the Taxpayers were not entitled to a temporary injunction against the issuance of the bonds and by requiring the Taxpayers to post security to continue their participation in the proceeding.

### Dismissal of Intervention

The trial court ordered the Taxpayers to post security in the amount of $10 million before the 11th day after the entry of the order. *See* Gov't § 1205.104(a). We have concluded that the trial court did not abuse its discretion by doing so. Because the Taxpayers did not post the required security by the statutory deadline, the trial court was required by statute to dismiss their intervention and did not abuse its discretion by doing so. *See id.* The Taxpayers also argue that the trial court could have waited until after the final judgment to dismiss their intervention. The statute states, "[t]he court shall dismiss an opposing party or intervenor who does not file a required bond before the 11th day after the date of the entry of the order setting

the amount of the bond ...." and does not support the Taxpayers' argument.

CONCLUSION

We affirm the trial court's orders requiring the Taxpayers to post security and dismissing their intervention.