



# OPINION

No. 04-11-00344-CV

**CITY OF SAN ANTONIO**,
Appellant

v.

**HEADWATERS COALITION, INC.**, A Sponsored Ministry of the Congregation of Sisters of
Charity of the Incarnate Word and the River Road Neighborhood Association,
Appellees

From the 408th Judicial District Court, Bexar County, Texas
Trial Court No. 2011-CI-05299
Honorable David A. Berchelmann, Jr., Judge Presiding

Opinion by:    Sandee Bryan Marion, Justice

Sitting:    Sandee Bryan Marion, Justice
Rebecca Simmons, Justice
Steven C. Hilbig, Justice

Delivered and Filed:  April 25, 2012

REVERSE AND DISSOLVE TEMPORARY INJUNCTION;
REMAND FOR FURTHER PROCEEDINGS

This is an accelerated appeal from the trial court's temporary injunction in favor of

appellees, Headwaters Coalition, Inc., A Sponsored Ministry of The Congregation of Sisters of

Charity of The Incarnate Word (hereinafter, "Headwaters") and The River Road Neighborhood

Association (hereinafter, "River Road").  This appeal arises from a dispute over the location of

the City of San Antonio's proposed drainage project along Broadway and Hildebrand.  Because

we conclude appellees did not establish a probable right of recovery, we reverse and dissolve the temporary injunction and remand for further proceedings.

## BACKGROUND

In 2007, the City enacted an ordinance

[o]rdering a bond election to be held on the 12th day of May, 2007, in the City of San Antonio, . . . on a proposed bond issue for streets, bridges, and sidewalk improvements, drainage improvements, parks, recreation, open spaces, and athletics improvements, . . .; specifying that said election shall be held jointly with other participating local political subdivisions within Bexar County; making provision for the holding of this election; and providing for an effective date.

. . .

BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF SAN ANTONIO [that "the following PROPOSITIONS shall be submitted in accordance with law:"]

. . .

### Drainage Improvements Proposition

Proposition No. 2

"Shall the City Council of the City of San Antonio, Texas be authorized to issue bonds of the City in the principal amount of $152,051,818 for the purpose of making public improvements for public purposes, to wit: providing drainage improvements and facilities for the removal of, and protection from, harmful excesses of water, whether constant or periodic, any other drainage or storm water improvements, and acquiring lands and rights-of-way necessary thereto, with respect to:

### Drainage Improvements

[list of twenty-six improvements, including:]
Broadway Corridor, Phase III A (Carnahan to 150 ft. north of Davis Road) . . . ."

After enacting the ordinance, the City made brochures available to the public that described the project. On May 12, 2007, the ballot presented to the voters stated as follows:

Drainage Improvements
Proposition No. 2
[Spanish translation]
"The issuance of bonds in the amount of $152,051,818 for drainage improvements" [Spanish translation]
___ For [Spanish translation]
___ Against [Spanish translation]

Voters approved the proposition.

Testimony at the hearing indicated that, prior to the May 2007 election, City staff assumed that the work to alleviate flooding on Broadway from Davis Court to Carnahan would involve placing drains under Broadway in that section of the road. Also prior to the election, the City created Community Bond Committees that were responsible for recommending capital improvement projects for possible inclusion in the 2007-2012 Bond Program. Barbara Witte-Howell, a River Road resident, was one of the committee members. The City took Witte-Howell and other committee members to the proposed location of the project on Broadway and explained where the project would be located and that the project called for the discharge of storm water into the San Antonio River at the existing Carnahan Channel. Witte-Howell and others recommended the Broadway Project to city council.

However, after the election, in late 2008, the City retained the engineering firm of Freese & Nichols to study the drainage issue and to design a drainage system for the project. The engineers determined that waters off Broadway flowed from Davis Court to the Broadway/Hildebrand intersection and then naturally flowed down Hildebrand to outfall into the San Antonio River, west of Broadway. The engineers also determined the pre-existing drain pipes and outfall were insufficient to convey the amount of water necessary to alleviate flooding on Broadway. As a result, the City still plans to begin the project at Broadway 150 feet north of Davis Road, but when the improvements reach the Broadway/Hildebrand intersection; the pipes,

drains, and curb inlets will be placed under Hildebrand and not Broadway. This project is referred to as "Alternative I."

On March 31, 2011, a City Council agenda item called for consideration of hiring a contractor to undertake drainage construction. The day before the council meeting, appellees filed suit requesting a temporary restraining order to prevent the council from voting on the agenda item. The trial court denied the request. The City Council then enacted an ordinance authorizing execution of the construction contract.

On April 11, 2011, appellees filed an amended petition seeking a declaratory judgment and an injunction to prohibit the City from "using 2007-2012 General Obligation Bond funds"

> to construct any outfall structure on the San Antonio River, in conjunction with the Broadway Corridor, Phase III A (Carnahan to 150 ft. north of Davis Road) project, including, but not limited to "Alternative I" as described in the January 28, 2009, Freese and Nichols report and the March 17, 2011, Miraflores Park Mitigation presentation[,]
>
> to enter onto Hildebrand Road and install culverts to convey storm water in conjunction with the Broadway Corridor, Phase III A (Carnahan to 150 ft. north of Davis Road) project, including, but not limited to "Alternative I" as described in the January 28, 2009, Freese and Nichols report and the March 17, 2011, Miraflores Park Mitigation presentation[, and]
>
> for any project that does not substantially comply with the terms of the bond.

Following hearings held on April 11 and 12, 2011, the trial court notified counsel it intended to grant the temporary injunction and asked counsel to prepare an order. Because the parties could not agree on an order, the trial court heard further arguments from the parties and, on May 11, 2011,[1] signed an order restraining the City from

> using the portion of 2007-2012 General Obligation Bond funds raised for the drainage project known as Broadway Corridor IIIA during the 2007 election to construct any part of "Alternative I" as described in the January 28, 2009, Freese

---

[1] After entry of the temporary injunction, appellees separately filed second amended petitions in which they dropped their request for a declaratory judgment and added a request for specific performance.

and Nichols report and the March 17, 2011, Miraflores Park Mitigation presentation[,]

using the portion of 2007-2012 General Obligation Bond funds raised for the drainage project known as Broadway Corridor IIIA during the 2007 election, for any drainage system or street improvement located anywhere else other than Broadway, beginning at Carnahan and continuing to 150 ft. north of Davis Court. That is, [the City] is free to use the bond funds for the Broadway Corridor IIIA along Broadway beginning at Carnahan and continuing to 150 ft. north of Davis Court, but not elsewhere[,]

constructing the outfall structure described in "Alternative I" in the January 28, 2009, Freese and Nichols report and the March 17, 2011, Miraflores Park Mitigation[, and]

commencing construction on a Drainage Project that includes connecting any partial portion of the Broadway Corridor Phase IIIA project to a separate drainage project on Hildebrand; stated another way, [the City] is restrained from commencing constructing a project that includes the portion of the Broadway Corridor Phase IIIA project between Davis Court and Hildebrand as doing so would effectively move the location of the Broadway Corridor drainage project and disrupt the *status quo* pending litigation.

The parties agreed to stay the proceedings pending the City's interlocutory appeal of the injunction to this court.

## STANDING

For the first time on appeal, the City challenges the standing of the appellees to bring the underlying suit for an injunction. The City contends appellees do not have standing because Headwaters was not a property owner at the time of the bond election and does not pay property taxes, and River Road presented no evidence that it, or any of its members, pay property taxes.

The Texas Supreme Court has stated that standing is determined at the time suit is filed in the trial court. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 n.9 (Tex. 1993); *see also Prize Energy Res., L.P. v. Cliff Hoskins, Inc.*, 345 S.W.3d 537, 550 (Tex. App.—San Antonio 2011, no pet.). Therefore, the issue is whether either or both appellees had standing when they filed suit. Standing focuses on the question of who may bring an action. *Patterson v.*

*Planned Parenthood of Hous.*, 971 S.W.2d 439, 442 (Tex. 1998). When, as here, standing is not conferred by statute, taxpayers must show they have suffered a particularized injury distinct from that suffered by the general public in order to have standing to challenge a government action or assert a public right. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555-56 (Tex. 2000) (citation omitted). An injury need not affect "vested" property rights to confer standing; the harm may be economic, recreational, or environmental. *Tex. Rivers Prot. Ass'n v. Tex. Nat'l Res. Conservation Comm'n*, 910 S.W.2d 147, 151-52 (Tex. App.—Austin 1995, writ denied).

Because standing is a component of subject-matter jurisdiction, it cannot be waived and, as here, may be raised for the first time on appeal. *City of Laredo v. R. Vela Exxon, Inc.*, 966 S.W.2d 673, 679 (Tex. App.—San Antonio 1998, pet. denied). When reviewing standing for the first time on appeal, we look to the facts alleged in the petition, we construe the petition in favor of the party, and if necessary, review the entire record to determine if any evidence supports standing. *Bland*, 34 S.W.3d at 555; *City of Laredo*, 966 S.W.2d at 679.

Here, appellees' petition alleges, and there is no dispute on the City's part, that Headwaters is a Texas non-profit corporation "created to preserve the Headwaters Sanctuary of the San Antonio River" and River Road is a Texas non-profit corporation "representing a membership of homeowners residing in the River Road Neighborhood of San Antonio," the purpose of which is to encourage the preservation of the neighborhood and Brackenridge Park, a municipal park.[2] Headwaters is a landowner immediately upstream from the Hildebrand Bridge at the San Antonio River. River Road is further downstream.

The petition alleges Headwaters, as ministry of the Sisters of Charity of the Incarnate Word, "has worked to build and advocate for a San Antonio River 'Spiritual Reach,' which is conceived and designed as a physical link between The San Antonio River Improvements Project

---

[2] Brackenridge Park is located just below the headwaters of the San Antonio River.

and the Headwaters Sanctuary." The petition also alleges the Alternative I outfall area will enter the proposed location of the San Antonio River Spiritual Reach.

Helen Ballew, Executive Director of the Headwaters Coalition, testified about the purpose of the sanctuary and the potential effect of the proposed Alternative I. Ballew explained Headwaters' purpose as caring for the fifty-three-acre headwaters nature sanctuary that the Sisters of Charity of the Incarnate Word set aside in 2008. The "headwaters" of the San Antonio River is referred to as the Blue Hole and is located within the sanctuary. Ballew explained the Headwaters Coalition was in the process of updating the master plan for the sanctuary, which is open to the public, for the purpose of adding additional nature trails and interpretive signage. The coalition is involved in ecological restoration of the sanctuary, and it provides environmental education to schools. The coalition is exploring the idea of connecting the northern terminus of the river improvement project to the historic springs of the Blue Hole. According to Ballew, "the critical point of connection would be precisely where this [Alternative I drainage] structure would be put." Ballew testified the planned construction of the outfall structure "would really take the heart out of" the planned ministry.

Barbara Witte-Howell, a member of the River Road neighborhood association, testified the association's purpose, among other things, includes researching and assessing projects planned by public or private agencies that may impact the neighborhood and interacting with such agencies to ensure compatibility of their plans with the wishes of the residents and landowners of the neighborhood.[3]

At the temporary injunction hearing, the City's Assistant Director of Public Works, Nefi Garza, agreed that the City had identified groups of people or entities as being stakeholders with

---

[3] According to Witte-Howell, the River Road Neighborhood Association is the second oldest neighborhood association in San Antonio.

a direct interest in the Broadway Corridor III A project. Among these entities are Headwaters and River Road. Garza agreed their interests are "directly impacted by the things that occur on the San Antonio River, the areas where the Broadway Corridor Phase III A project is going to be built . . . ." and "in the way storm water is handled going up and down Broadway . . . ." The City's Environmental Services Manager, John Cantu, testified his job was to oversee the environmental management division of the City that assesses the environmental impact related to capital improvement projects. Cantu testified that, as part of the Broadway Corridor III A project, the City obtained a permit from the U.S. Army Corps of Engineers ("the Corps") because the project called for an outfall structure at the intersection of Hildebrand and the San Antonio River. Also, because the project would have an adverse impact on Miraflores Park,[4] the City was required to enter into a "memorandum of agreement" with the Corps under which the City agreed to mitigation and restoration of any adverse impact to the park. The Texas Historical Commission ("the THC") was also a party to the memorandum of agreement. On March 31, 2011, the City passed an ordinance approving the execution of the memorandum with the THC and the Corps "regarding the restoration to Miraflores Park and other Project components as a result of construction of the Broadway-Hildebrand Project . . . ." The Corps designated appellees as "concurring" parties, meaning they were given the opportunity to review the memorandum, all associated studies, and provide comments to the Corps regarding the project.

Based on this record, we conclude appellees have standing because they have shown they will suffer a "particularized injury distinct from that suffered by the general public."

---

[4] This park is located south of and abuts Hildebrand and is across Hildebrand from the University of Incarnate Word.

**STANDARD OF REVIEW FOR TEMPORARY INJUNCTIONS**

The decision to grant or deny a temporary injunction is within the trial court's sound discretion. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). A trial court abuses its discretion when it does not properly apply the law to the undisputed facts, when it acts arbitrarily or unreasonably, or when its ruling is based on factual assertions unsupported by the record. *Remington Arms Co., Inc. v. Luna*, 966 S.W.2d 641, 643 (Tex. App.—San Antonio 1998, pet. denied).

A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993) (per curiam). To obtain a temporary injunction, the applicant must plead and prove (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru*, 84 S.W.3d at 204. To show a probable right to recovery, the applicant is not required to establish it will prevail on final trial. *Id.* at 211. However, if the applicant does not plead a cause of action and present some evidence that supports a probable right of recovery, then a temporary injunction is not proper. *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 23-24 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd). An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Butnaru*, 84 S.W.3d at 204.

Having concluded the appellees have standing, appellees had to show a probable, imminent, and irreparable injury in the interim and a probable right to the relief sought. As discussed above in our consideration of whether appellees had standing, we believe the record indicates appellees would suffer a probable, imminent, and irreparable injury in the absence of a temporary injunction. Therefore, we next turn to the question of whether appellees established a

probable right to recovery. The answer to this question lies in the wording of the bond ordinance.

## INTERPRETATION OF THE BOND ORDINANCE

In this case, the appellees sought an injunction under the "contract with voters" doctrine, arguing the City violated its contract with voters when it changed the project from the Broadway Corridor III A project to the Alternative I project. Whether characterized as a "contract with voters" suit or, as argued by the City, a "taxpayer suit," there is no dispute that proceeds of bonds voted by the people must be expended for the purposes for which they were voted. *Lewis v. City of Fort Worth*, 126 Tex. 458, 89 S.W.2d 975, 978 (1936); *Taxpayers for Sensible Priorities v. City of Dallas*, 79 S.W.3d 670, 676 (Tex. App.—Dallas 2002, pet. denied). However, where the law grants a governing body the duty to exercise its sound judgment and discretion, courts may not interfere so long as such body acts lawfully. *Id.* In other words, the governing body has the right to exercise its sound discretion in expending bond proceeds for the purposes for which the bond was sold. *Id.* A city violates its "contract" with voters only if it uses tax proceeds approved by the voters in a way that the voters did not approve. *Putnam v. City of Irving*, 331 S.W.3d 869, 878 (Tex. App.—Dallas 2011, pet. denied).

On appeal, the City argues it wants to expend bond proceeds for the purposes for which they were voted. The City asserts the language of Proposition No. 2 "speaks in general terms of funding 'drainage improvements and facilities for the removal of, and protection from, harmful excesses of water . . . with respect to'" several locations, including "Broadway Corridor, Phase III A (Carnahan to 150 ft. north of Davis Road)." According to the City, two types of projects are described in Proposition No. 2. One type authorizes the City to issue bonds, the proceeds from which will be used to provide drainage improvements and facilities to be used for the

removal of and protection from harmful excesses of water. The second type provides for drainage or other storm water improvements and for the acquisition of lands and rights of way necessary for such purposes. The City asserts the Broadway Corridor III A project is an example of the first type of project—a project whose purpose is flood relief. Therefore, the City concludes, it is entitled to enforcement of the plain language of the ordinance and the trial court erred by enjoining it from constructing a drainage system it determined most efficiently protected that area of Broadway from flooding.

Appellees counter that Broadway, and not Hildebrand, was the intended location when the "contract with the voters" was executed. Appellees pose the question as "whether it matters that the City changed its mind [about the location of the public works project] after it took the money." Appellees contend the City's post-election "honest judgment" that Hildebrand was a better location is inconsequential. According to appellees, because the location "Carnahan to 150 ft. north of Davis Road" was specifically included in Proposition No. 2, that location became an essential part and purpose of the "contract with the voters."

Courts use the same rules when construing municipal ordinances as they use when construing statutes. *Bd. of Adjustment of San Antonio v. Wende*, 92 S.W.3d 424, 430 (Tex. 2002). Courts construe statutes and ordinances as a matter of law. *Arredondo v. City of Dallas*, 79 S.W.3d 657, 667 (Tex. App.—Dallas 2002, pet. denied). When the construction of municipal ordinances is involved, as when statutory construction is involved, our primary duty is to carry out the intentions of the municipality's legislative body. *Bolton v. Sparks*, 362 S.W.2d 946, 951 (Tex. 1962); *City of Dallas v. Blanton*, 200 S.W.3d 266, 277 (Tex. App.—Dallas 2006, no pet.). We look first to the plain meaning of the words. *Wende*, 92 S.W.3d at 430. We also look to the entire agreement in an effort to give each part meaning. *Coker v. Coker*, 650 S.W.2d 391, 393

(Tex. 1983). If the language is unambiguous, we interpret the ordinance using its plain language unless that interpretation leads to absurd results. *See Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 177 (Tex. 2004). In this case, we interpret the bond ordinance as a matter of law to determine whether the City violated its contract with the voters. If Alternative I is not a use of tax proceeds in a manner approved by the voters, the trial court did not abuse its discretion in granting the temporary injunction. If, on the other hand, Alternative I is a use of tax proceeds in a manner approved by the voters, the granting of the injunction was an abuse of discretion because appellees did not, as a matter of law, establish a probable right to recovery.

We first address the City's contention that this court may appropriately look to the election ballot and the City's Informational Guide to corroborate its interpretation of Proposition No. 2's language. The ballot did not identify any locations, but instead, simply asked the voters to approve or disapprove "[t]he issuance of bonds in the amount of $152,051,818 for drainage improvements." The Informational Guide describes the purpose of the Broadway Corridor, Phase III A project as providing "a drainage system that is designed to convey a 100-year storm event across Broadway, improving the Broadway corridor beginning at Carnahan and terminating at Davis Court."

We do not agree with the City's contention that we may properly look to the Informational Guide or ballot in interpreting the bond ordinance. First, neither party asserts the language of the ordinance is ambiguous. Only when the words are ambiguous do we "resort to rules of construction or extrinsic aids." *In re Estate of Nash*, 220 S.W.3d 914, 917 (Tex. 2007). Second, our inquiry should be focused on whether the City is attempting to use tax proceeds approved by the voters in a way that the voters did not approve. The answer to that question lies

in the plain language of whatever constitutes the "contract with the voters," which here, is the bond ordinance.  Therefore, we turn to the following unambiguous language which we interpret as a matter of law:

Proposition No. 2

"Shall the City Council of the City of San Antonio, Texas be authorized to issue bonds of the City in the principal amount of $152,051,818 for the purpose of making public improvements for public purposes, to wit: providing drainage improvements and facilities for the removal of, and protection from, harmful excesses of water, whether constant or periodic, any other drainage or storm water improvements, and acquiring lands and rights-of-way necessary thereto, with respect to:

**<u>Drainage Improvements</u>**

[list of twenty-six improvements, including:]
Broadway Corridor, Phase III A (Carnahan to 150 ft. north of Davis Road) . . . ."

According to the City, this language did not provide specific details as to the method of conveying the storm waters across Broadway to improve Phase III A of the Broadway Corridor. The City focuses on the language authorizing funds "for the purpose of making improvements for public purposes, to wit: providing drainage improvements and facilities for the removal of, and protection from, harmful excesses of water, whether constant or periodic, [and] any other drainage or storm water improvements."  Appellees assert that Proposition No. 2's definition of the "Broadway Corridor Phase III A" as "Carnahan to 150 ft. north of Davis Road" forms part of the contract because Proposition No. 2 not only described a physical public improvement and facility, but also provided for its actual physical location.  Appellees argue that the terms "public improvements," "improvements," and "facilities" are used to mean a physical structure, as opposed to the mere description that something is improved, gets better, or is enhanced.

Proposition No. 2 lists twenty-six drainage projects.  Many, like the Broadway III A project, state a specific location.  For example, one project is listed as "Alamo Farmstead Area

Drainage – Rochelle (Ambush to Whitby)" and another is listed as "Marbach Drainage, Phase II A (Military to west of Rawhide"). Others do not state a specific location; for example, "Fort Sam Houston Drainage" and "Kentwood Manor Drainage, Phase I." Although we agree with appellees that the statements of location have some significance, when we look to the other four propositions contained in the bond ordinance, we do not agree with appellees' interpretation of these locations.

The stated purpose of Proposition No. 1 is the "making [of] permanent public improvements for public purposes, to wit:"

> providing streets, bridges, and sidewalk improvements [and necessary incidental improvements], relocating utilities, street lighting, technology improvements, and signage, and acquiring lands and rights-of-way necessary for streets, bridges, and sidewalks, with respect to: [specific locations].

The stated purpose of Proposition No. 3 is the "making [of] permanent public improvements for public purposes, to wit:"

> acquiring, constructing, equipping, and renovating park, cultural, recreation, open space, and athletics improvements, making park additions, and acquiring lands and rights-of-way necessary thereto, with respect to: [specific parks, community centers, gardens, pools, gyms, and so forth].

The stated purpose of Proposition No. 4 is the "making [of] permanent public improvements for public purposes, to wit:"

> acquiring, constructing, improving, renovating, and/or equipping public library facilities, and/or other learning center facilities to be utilized as libraries, and acquiring land and rights-of-way necessary thereto with respect to: [eleven specified libraries].

The stated purpose of Proposition No. 5 is the "making [of] permanent public improvements for public purposes, to wit:"

> constructing, improving, renovating, and equipping health facilities available to the general public and acquiring land and rights-of-way necessary thereto with respect to: [one specified clinic and one specified health care center].

Each of the above propositions has the same general purpose: a *permanent* public improvement. In contrast, Proposition No. 2 does not include the word "permanent" in its stated purpose of "making public improvements for public purposes." Proposition Nos. 3, 4, and 5 all speak in terms of "*constructing, improving, renovating, and equipping*" a specific *type* of facility at specified locations. In contrast, Proposition No. 2 speaks only generally in terms of "*providing* drainage improvements and facilities for the removal of, and protection from, harmful excesses of water, whether constant or periodic, [and] *any other* drainage or storm water improvements" at specified locations.

If we are to give effect to all the words chosen by the City in drafting the bond ordinance, we must assign meaning to each word in a consistent manner. The words "permanent" and "constructing, improving, renovating, and equipping" do not appear in Proposition No. 2. The absence of this language leads us to conclude that the purpose of the project does not call for the building of structures on a specific portion of Broadway (Carnahan to 150 feet north of Davis Road). Instead, we interpret "Carnahan to 150 ft. north of Davis Road" as a statement of the City's intention to expend public funds for the purpose of providing flood relief along that portion of Broadway. To that extent, the City "by deliberate action" made the location of the improvement to drainage a part of the "contract with the voters." However, the bond ordinance does not state how the goal of providing storm drainage along this portion of Broadway will be achieved. Instead, the bond ordinance leaves that to the discretion of the City. We, therefore, conclude the purpose for which the bond was sold was to provide flood relief and not the placement of physical structures at a specific location.

**CONCLUSION**

"The specific use to which it is intended by public officials that public moneys shall be applied is always of concern to those upon whom taxation rests the burden of the expenditure." *Moore v. Coffman*, 109 Tex. 93, 200 S.W. 374, 375 (Tex. 1918). The location of expensive permanent structures necessary to facilitate a "public improvement" and the consequences of placing such structures in a particular location are "frequently of as prime importance as its construction." *Id.* "In such cases it is only fair to the voters in the election called to determine the matter to inform them *in advance* of the intended location [of any permanent structures], so that the actual merits of the given proposal, into which the question of location may largely enter, shall decide the contest." *Id.* [Emphasis added.]

We sympathize with the appellees who actively participated in the process leading up to the bond election. Whether as voters, taxpayers, or simply citizens of our City, appellees were entitled to rely on the City's representations leading up to the bond election. More importantly, all citizens, and particularly those affected by structures constructed for the purpose of a public improvement, should have confidence that City officials have done their "homework" when planning public improvements and prior to asking citizens to pay for the improvements. Otherwise, a loss of voter confidence may translate into a vote "against" public expenditures.

However, Proposition No. 2 did not state with specificity how "drainage improvements and facilities for the removal of, and protection from, harmful excesses of water, whether constant or periodic, with respect to . . . Broadway Corridor, Phase III A (Carnahan to 150 ft. north of Davis Road)" would be accomplished. Therefore, we must conclude it is within the City's discretion to determine that Alternative I accomplishes the purpose of the ordinance. Accordingly, appellees did not demonstrate they have "a probable right to the relief sought." We

reverse the trial court's order, dissolve the temporary injunction, and remand this cause to the trial court for further proceedings.

Sandee Bryan Marion, Justice