**CITY OF LAREDO, Appellant,**

v.

**R. VELA EXXON, INC. d/b/a Vela–Comer Exxon, Robert Vela, as shareholder and individually, Luxandra Vela Comer, as shareholder and individually, Appellees.**

No. 04–97–00192–CV.

Court of Appeals of Texas, San Antonio.

Feb. 27, 1998.

Rehearing Overruled March 30, 1998.

William M. McKamie, Patrick C. Bernal, Denton, McKamie & Navarro, P.C., San Antonio, for Appellant.

John Judge, Jefferson K. Brim, III, Judge & Brim, P.C., Austin, for Appellee.

Before HARDBERGER, C.J., and RICKHOFF and DUNCAN, JJ.

## OPINION

HARDBERGER, Chief Justice.

The appellees, R. Vela, Inc. d/b/a/ Vela–Comer Exxon, Robert Vela, as shareholder and individually ("Vela"), and Luxandra Vela Comer, as shareholder and individually ("Vela Comer"), sued the appellant, City of Laredo ("City"), alleging a taking of their property and the creation of a nuisance based on the blockage of access to their Exxon station by commercial truck traffic. The taking claim was submitted to the trial court as a question of law, and the nuisance claim was submitted to a jury who found in favor of the appellees. The trial court entered a judgment on the jury's verdict, but disallowed the jury's award of personal discomfort and annoyance damages. The trial court subsequently entered findings of fact and conclusions of law in favor of the City which are in conflict with its prior judgment. In six points of error, the City complains that the trial court erred in rendering judgment against the City on the appellees' claims. In two cross-points, the appellees complain about the trial court's failure to render the jury's award of personal discomfort and annoyance damages and its disallowance of Vela Comer's testimony concerning her personal damages. We modify the trial court's judgment to conform to its findings of fact and conclusions of law and affirm.

### FACTS

Vela and Vela Comer are owners and operators of the Vela–Comer Exxon station ("Station"), located at the intersection of Scott Street and Santa Ursula Streets in Laredo, Texas. On December 23, 1992, the appellees sued the City alleging a taking of property and a creation of a nuisance based on their

customers' inability to access the Station due to commercial truck traffic on Scott Street.

In 1978, Scott Street and numerous other streets were designated by City Council as truck routes. In 1986, Mexico adopted the General Agreement on Trade and Tariffs, significantly increasing the amount of commercial truck traffic entering into Mexico, and thereby increasing the traffic congestion along Scott Street. The congestion was caused by the amount of time that Mexican authorities required to inspect and process the trucks through customs.

The City Council had the authority to eliminate existing truck routes and designate new truck routes. In 1989, one of the truck routes that was designated in 1978, Santa Maria, was eliminated.[1] In 1989 or 1990, a new truck route, Santa Anna, was designated.

In September of 1990, the employees of businesses along Scott Street signed a petition expressing their concerns regarding the traffic congestion and demanding that the City divert the truck traffic away from Scott Street and establish a better and safer truck route. A similar petition was signed by the residents and property owners along Scott Street.

On October 1, 1990, the City Council requested the Transportation and Traffic Safety Advisory Committee ("Transportation Committee") to consider the advantages and disadvantages of eliminating Scott Street and Washington Street as designated truck routes. On October 3, 1990, the Transportation Committee held a public meeting on the issue. After deliberating the subject among themselves and with City staff, the Transportation Committee unanimously recommended to the City Council that Scott and Washington Streets not be eliminated as truck routes. The City staff agreed with this recommendation, and the City Council adopted the recommendation.

On the same day, the Senior Vice President of the International Bank of Com-

merce,[2] J. Jorge Verduzco, wrote a letter to Peter Vargas, the City Manager, explaining that the petitioners did not wish to close Scott Street to truck traffic but wanted to divert the traffic "away from the metropolitan area of the city to assure public safety, proper access to downtown businesses, and avoid damage to private and public property." Verduzco recognized that there were no overnight or easy solutions to the traffic problem but requested that the problems, which were largely ignored or poorly addressed in the past, be immediately addressed in a creative manner. Verduzco recommended that the City explore the creation of new truck routes and undertake a truck traffic survey of all truck routes that would enable the City to analyze the traffic patterns.

The letter was referred to the Director of Transportation, Joe Aranda ("Aranda"). Aranda requested that the City's traffic safety director and traffic engineer undertake an in-depth study as soon as possible regarding the possibility of converting Scott Street into a one-way street. Aranda also prepared a newsletter, informing City Council that the City staff was studying ways in which to minimize the inconveniences created by the tractor-trailers to the citizens who reside along Scott Street. The newsletter detailed that three enhancements were planned: (1) interconnection of signal timings on Scott Street to optimize signal timing; (2) encouraging use of a different street by reversing stop signs; and (3) installing more speed limit signs to deter speeding. Finally, the newsletter mentioned that certain City officials met with the new Customs Administrator in Nuevo Laredo, who informed them that a new transformer had been installed to improve computer functioning and that an import lot was being planned to store the tractor-trailers on the Mexican side until they were processed.

At trial, Vela Comer testified that beginning in January of 1991, traffic came to a standstill on Scott Street for periods of twelve hours a day during the Station's busi-

---

1. Carlos Villareal, the assistant city manager, testified that Santa Maria was eliminated as a truck route because three schools were located near that street.

2. The bank is located across the street from the Station.

ness hours. She further testified that she contacted numerous City officials on numerous occasions, but the traffic problem continued through August or September of 1991. Although Vela Comer acknowledged that the City did provide a holding tank at a local mall where trucks would park until space was available for processing, Vela Comer testified that the holding tank provided no relief because it would immediately fill and additional trucks kept arriving to cross into Mexico. At one point, Vela Comer testified that she requested a map of the truck routes, but Aranda did not provide her with the map for three weeks. She further testified that when Aranda delivered the map he told her that Scott Street was a truck route and that was the way it was going to stay. Vela Comer testified that as a result of the blocked access, the Station lost $41,500 in profit on sales. Furthermore, Vela Comer testified that the blocked access violated safety regulations requiring access to the business by fire trucks due to the hazardous nature of gasoline.

Patrick McGannon, a customer of the Station, testified that he had difficulties accessing the Station due to heavy truck traffic. He stated that he would have to wait at least 15 minutes before he was able to enter the Station and then would have difficulty leaving. On cross-examination, McGannon stated that his access was blocked at least three or four times during 1991.

E.J. Laurel was employed as the chief of police for the City of Laredo from April of 1991 to October of 1991. Laurel testified that he often dispatched officers to direct traffic on Scott Street or directed traffic himself. He stated that at least three times he directed traffic when he noticed that the Station was blocked.

Craig Comer, the general manager of the Station, testified that access to the Station was blocked most hours of the day from January, 1991 to November, 1991. He testified that the traffic problem was unique to the Station because other businesses along Scott Street could be accessed by side streets. Comer testified that he had several conversations with City officials regarding the traffic problem. Comer further testified

that the Station could not support its second mechanic due to the loss in business.

Verduzco, the bank vice-president, testified that the traffic problem was worse in 1991. He stated that he had problems accessing the Station as a customer and that the general smoke and noise from the truck traffic were also problems. Verduzco stated that no progress was made in resolving the traffic problem in 1990 and the efforts at resolving the problem during 1991 were not made with the sense of urgency that Verduzco believed was necessary.

Both Aranda, the director of transportation, and Villareal, the assistant city manager, testified on behalf of the City of Laredo. Aranda detailed the City Council's actions in 1990 with respect to the traffic problem. Aranda stated that the problem was caused by the processing of the trucks through Mexican customs. To alleviate the problem, the City lent Mexico an additional toll booth to try to speed processing. In addition, the City developed the holding lot at the mall. Furthermore, police officers were often dispatched to direct traffic. Finally, plans were progressing for the opening of additional bridges to divert truck traffic from the downtown area.

On cross-examination, Aranda admitted that during the fall of 1990 and possibly during 1991 truck traffic was diverted from Washington Street due to concerns regarding the effect of the traffic on the community college. Aranda agreed that such a diversion would likely increase the traffic on Scott Street. Aranda further admitted that the corner of Scott Street and Santa Ursula was clipped in 1990 to improve the turning radius for the truck traffic.

The trial court submitted the nuisance claim to the jury. The jury found that the City did not create a nuisance by directing truck traffic onto Scott Street adjacent to the Station prior to December 23, 1990, but the jury did find that the City created such a nuisance during the period January 1, 1991 through September 10, 1991. The jury then awarded the appellees $41,500 in lost earnings and $207,500 in personal discomfort and annoyance damages.

### CONTRADICTION BETWEEN JUDGMENT AND CONCLUSIONS OF LAW

In its first point of error, the City contends that the trial court erred in rendering judgment against the City based on a taking of property because the trial court's findings of fact and conclusions of law conclusively established no such taking occurred as a matter of law.

In its judgment signed on January 31, 1997, the trial court found that the City had substantially impaired access to the Station during the period of January 1, 1991 through September 10, 1991, and that such impairment constituted a taking. However, the trial court granted the City's motion to disregard the jury's verdict with respect to the personal annoyance and discomfort damages. The trial court rendered judgment against the City for $41,500.

On March 18, 1997, the trial court entered findings of fact and conclusions of law. In contradiction of the judgment, the trial court concluded that the City was not liable to plaintiffs for an unconstitutional taking for numerous reasons, including: (1) the individual plaintiffs lacked standing to assert the taking claim; and (2) the City did not engage in any direct restriction on the plaintiffs' ability to use their property.

Findings of fact and conclusions of law filed after a judgment are controlling if there is any conflict between them.[3] *Arena v. Arena*, 822 S.W.2d 645, 652 (Tex.App.—Fort Worth 1991, no writ); *Bendele v. Tri-County Farmer's Co-op*, 635 S.W.2d 459, 469 (Tex.App.—San Antonio), *aff'd as modified*, 641 S.W.2d 208 (Tex.1982); *Law v. Law*, 517 S.W.2d 379, 383 (Tex.Civ.App.—Austin 1974, writ dism'd). When an appellate court is presented with a conflict between a judgment and subsequent findings and conclusions, the appellate court has the power to modify the judgment to conform with the findings of fact and conclusions of law. *Arena v. Arena*, 822 S.W.2d at 652. The appellees contend that we must apply a no evidence standard of

review in undertaking such modifications, treating such modifications as a judgment non obstante verdicto. We agree in part. If there is no evidence in the record to support the subsequent finding, we are not required to modify the judgment to reflect that finding. *Cole v. Cole*, 880 S.W.2d 477, 483 (Tex. App.—Fort Worth 1994, no writ). Similarly, we conclude that we are not required to modify a judgment to reflect an erroneous conclusion of law. Therefore, we will analyze each of the appellees' claims against the City in light of the trial court's findings of fact and conclusions of law and the evidence presented to determine whether modification of the trial court's judgment is appropriate.

### TAKING

In addition to concluding that the individual plaintiffs lacked standing to assert the taking claim and that the claim was barred by limitations, the trial court also concluded that no taking had occurred for numerous reasons, including: (1) the City did not engage in any direct restriction or undertake any intentional conduct or activity causing the impairment; (2) the impairment was a partial, temporary condition; and (3) the traffic congestion affected the community at large.

### 1. Standard of Review

With regard to the trial court's findings of fact, we review the findings under a legal sufficiency standard of review. *Cole v. Cole*, 880 S.W.2d at 483–84. In considering a legal sufficiency point, we consider only the evidence favorable to the decision of the trier of fact and disregard all evidence and inferences to the contrary. *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 459 (Tex. 1992); *Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex.1988).

Whether property has been 'damaged' under the constitution and whether access rights have been materially and substantially impaired are questions of law.

---

**3.** During oral argument before this court, appellees' counsel implied that this general rule was reserved for bench trials and was inapplicable to jury trials. Even if this were true, the parties in this case agreed that the takings claim was a question of law to be decided by the trial court. The trial court's resolution of the takings issue necessarily impacts the jury's verdict relating to the nuisance claim for the reasons later expressed in this opinion.

*State v. Heal*, 917 S.W.2d 6, 9 (Tex.1996). We review the trial court's determination of such questions of law without deference to the lower court's conclusion. *Id.*

## 2. Standing

The City contends that the individual appellees lack standing to pursue the taking claim because the business operation was conducted by R. Vela, Inc., lessee of the property, and the real property owner was the Exxon Corporation, who is not a party to the case. The appellees counter that Vela is a shareholder in the corporation that owned the Station and Vela Comer held the lease from Exxon as the dealer at that service station.

 "Standing is implicit in the concept of subject matter jurisdiction;" therefore, "it cannot be waived and may be raised for the first time on appeal." *Texas Ass'n of Business v. Texas Air Control Bd.*, 852 S.W.2d 440, 443, 445 (Tex.1993). When a Texas appellate court reviews the standing of a party for the first time on appeal, it must construe the petition in favor of the party, and if necessary, review the entire record to determine if any evidence supports standing. *Id.* at 446.

In the appellees' petition, R. Vela Exxon, Inc. is identified as "a Texas corporation doing business as VELA–COMER EXXON, a full-service gasoline station...." Roberto Vela is identified as a shareholder and president of R. Vela, Inc., and Luxandra Vela Comer is identified as the Exxon dealer of the Station. During trial, Vela Comer testified that as an independent dealer for Exxon, the location of the Exxon station is leased to her by Exxon Company USA. She also testified that R. Vela Exxon, Inc. is the operator of the Station.

 The general test for standing in Texas requires that there be a real controversy between the parties that will be actually determined by the judicial declaration sought. *Texas Ass'n of Business*, 852 S.W.2d at 446. A leasehold is property, and a lessee is considered an "owner" and is entitled to compensation when all or part of the leased property is taken by eminent domain. *Texas Pig Stands, Inc. v. Krueger*, 441 S.W.2d 940, 944 (Tex.Civ.App.—San Antonio 1969, writ ref'd n.r.e.); *see also Elliott v. Joseph*, 163 Tex. 71, 351 S.W.2d 879, 883–84 (1961). If a leasehold is taken without adequate compensation, a real controversy exists between the governmental entity that took the property and the lessee that will be actually determined by judicial declaration. Therefore, a lessee has standing to challenge an unconstitutional taking. *See G.P. Show Productions, Inc. v. Arlington Sports Facilities Development Authority, Inc.*, 873 S.W.2d 120 (Tex.App.—Fort Worth 1994, no writ)(action by lessee challenging amount of condemnation award).

 The evidence presented in this case supports a finding that Vela Comer is the lessee of the property owned by Exxon Company USA. In addition, R. Vela Exxon, Inc., as the operator of the Station and owner of permanent improvements, also owns a compensable property interest. *Cf. Brunson v. State*, 418 S.W.2d 504, 506–07 (Tex.1967). As a shareholder in R. Vela Exxon, Inc., however, Vela does not have a property interest for which compensation would be owed. *See id.* at 123 n. 4. Therefore, Vela would not have standing to challenge the City's action as a taking.

## 3. Absence of Direct Restriction or Intentional Act

The trial court concluded that no taking had occurred because the City did not engage in any direct restriction or undertake any intentional conduct or activity causing the impairment of access.

 The Texas Constitution provides:

No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made....

TEX. CONST. art. I, § 17. A landowner is entitled to compensation under the constitution whenever access to his property is materially and substantially impaired. *State v. Heal*, 917 S.W.2d at 10. In the *Heal* case, the Texas Supreme Court left open the possibility that traffic can materially and substantially impair access, concluding:

All of our prior impaired access cases involved physical obstructions created by a public improvement. Here, the Heals allege that traffic will impair their access. The primary factual difference is that traffic will fluctuate—at times there will be congestion and at other times there will be free access. And even when there is congestion, access is not materially and substantially denied. Nevertheless, at this time we need not hold, as a matter of law, that traffic can never materially and substantially impair access such that a constitutional taking occurs. Rather, we hold only that, under these facts, traffic will not impair the access to the Heals' property enough to justify severance damages.

*Id.* at 11.

■ Although the *Heal* court did not rule out the possibility that traffic can result in a taking, no taking or damaging under article I, section 17 of the Texas Constitution can occur where the government has not directly restricted the use of the landowner's property. *Westgate, Ltd. v. State*, 843 S.W.2d 448, 452 (Tex.1992). A direct restriction is defined as "an actual physical or legal restriction on the property's use, such as a blocking of access or denial of a permit for development." *Id.* As noted in *Heal*, all of the impaired access cases considered by the Court involved physical obstructions created by a public improvement. 917 S.W.2d at 11. In *Heal*, the increased traffic resulted from the city's action in widening a public street. *Id.* at 7.

■ In this case, the City has not imposed an actual physical or legal restriction on the use of the Station. Nor has the City undertaken any public improvement which tangentially affects the traffic flow in front of the Station. The only action taken by the City relating to traffic flow that negatively impacted the Station was its refusal to eliminate Scott Street as a designated truck route and its redirection of traffic from one of the other designated truck routes in 1990. We agree with the City that this is not the type of direct restriction which is a prerequi-

site to finding liability for a taking of property. Therefore, we modify the judgment in favor of the City on the taking claim.[4]

## NUISANCE

The jury found that the City of Laredo created a nuisance by directing truck traffic onto Scott Street from January 1, 1991 through September 10, 1991. The trial court concluded that the City of Laredo was not liable for taking. Therefore, we must determine whether the City of Laredo can be held liable for nuisance in the absence of a taking.

■ The City contends that a municipality can be liable for nuisance only if: (1) an invasion of property rights arises through the performance of a governmental function for which there is a waiver of sovereign immunity under the Texas Tort Claims Act; or (2) intentional conduct results in a taking or damaging under Article I, Section 17 of the Texas Constitution. *See Bragg v. City of Dallas*, 605 S.W.2d 669, 671 (Tex.Civ.App.—Dallas 1980), *rehearing denied*, 608 S.W.2d 696 (Tex.Civ.App.—Dallas 1980, no writ). The appellees do not refute the City's argument but merely contend that the City may be held liable for creating a nuisance under the takings clause of the Texas Constitution. Since the appellees' nuisance claim is based on a finding of a taking, it fails for the reasons expressed in discussing the taking claim, i.e., no direct action.

■ A municipality can only be liable for creating a nuisance in the non-negligent performance of a governmental function. *City of Tyler v. Likes*, 41 Tex. Sup.Ct. J. 174, 184 (Dec. 11, 1997); *Sipes v. Texas Dept. of Transp.*, 949 S.W.2d 516, 522 (Tex.App.—Texarkana 1997, writ denied); *Bible Baptist Church v. City of Cleburne*, 848 S.W.2d 826, 829 (Tex.App.—Waco 1993, writ denied). "Non-negligence in this context means beyond negligence, as in gross negligence or an intentional act." *Sipes*, 949 S.W.2d at 522.

In *Likes*, the plaintiff's property was flooded when a watershed flooded causing water

---

4. Because we conclude that the trial court's judgment must be modified based on the absence of a direct restriction or intentional act, we do

not address the trial court's other findings and conclusions relating to the takings claim.

to overflow an open drainage channel running across the plaintiff's property. 41 Tex. Sup.Ct. J. at 174. The Court asserted that the City of Tyler produced summary judgment evidence that it did not intentionally do anything to increase the amount of water in the watershed. *Id.* at 184. "The culvert system was substantially completed before 1940, more than ten years before Like's home was built, and the City [had] made no improvements since then to increase the amount of water in the watershed." *Id.*

In this case, the only intentional act by the City was the designation of Scott Street as a truck route. However, similar to *Likes,* the designation was made in 1978, and no additional action was taken with respect to that designation since 1978. The designation of the truck route did not constitute an unlawful invasion of property. While the diversion of traffic from another designated truck route may have increased the traffic on Scott Street, no intentional action by the City caused the traffic congestion. Rather, it was the use of the truck route by an ever-increasing number of trucks that has created the traffic problem of which appellees complain. Therefore, we modify the judgment in favor of the City on the nuisance claim.

## CONCLUSION

The judgment of the trial court is modified to conform with the trial court's findings of fact and conclusions of law as discussed in this opinion, resulting in a take-nothing judgment in favor of the City. Appellees' cross-points, complaining about the damage award in the trial court's judgment, are rendered moot by this modification. As modified, the judgment of the trial court is affirmed.