

# NUMBER 13-20-00469-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF Z.J.M.A., A CHILD

### On appeal from the 25th District Court
### of Guadalupe County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Longoria
Memorandum Opinion by Chief Justice Contreras**

Appellant Christine Alexander Ragan appeals from the trial court's order modifying the parent-child relationship with respect to her daughter Z.J.M.A., a minor child. The order provides that appellee Eric Muehlfeld, the child's father, shall have six four-hour supervised visits with the child, to be followed by standard unsupervised visitation. By twenty-one issues, Ragan argues the trial court erred by: (1) denying her request for a custody evaluation; (2) making various conclusions of law, including finding that the modification was in the best interests of the child; (3) appointing a parenting facilitator;

and (4) awarding attorney's fees and expenses to Muehlfeld and not to Ragan. We affirm as modified.[1]

## I.   BACKGROUND

### A.   Procedural Background

Z.J.M.A. was born to the parties on January 22, 2015. On May 7, 2015, the trial court rendered a divorce decree appointing Ragan sole managing conservator of the child and Muehlfeld possessory conservator, and directing Muehlfeld to pay child support of $350 per month. The decree generally provided that, until the child is three years old, Muehlfeld shall have supervised possession of Z.J.M.A. for two hours on Tuesdays, two hours on Thursdays, four hours on alternate Saturdays, four hours on alternate Sundays, and certain holidays. After the child turns three, the decree stated generally that Muehlfeld shall have standard unsupervised possession—that is, alternate weekends, Thursday evenings, an extended period during the summer, and certain holidays. *See* TEX. FAM. CODE ANN. §§ 153.3101–.3171.

On November 22, 2017, Muehlfeld filed a "Motion for Clarification of Prior Order for Possession or Access" in which he requested (1) clarification about the times and locations of possession transfers, and (2) modification of the decree to allow additional periods of visitation. He alleged in the motion that Ragan "failed to comply" with the decree on thirteen occasions between April and August of 2017.

On January 4, 2018, Ragan filed a "Petition to Modify Parent-Child Relationship" in which she alleged that "[t]he circumstances of the child, a conservator, or other party

---

[1] This appeal was transferred from the Fourth Court of Appeals in San Antonio pursuant to an order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001.

affected by the order to be modified have materially and substantially changed since the date of rendition of the order to be modified." The petition alleged in particular that Muehlfeld "failed to comply with the agreed terms for visitation" and "failed to establish a positive relationship with the child," and that Z.J.M.A. "shows periods of developmental regression and outward signs of post traumatic stress disorder when confronted with visitation with her father or the possibility of such." Ragan requested that the trial court order Muehlfeld "to comply with any additional visitation schedule as outlined by her current doctors and therapists and to initiate therapeutic visitation to establish a relationship with the child." Alternatively, if Muehlfeld "refuses to abide by the recommendations of the child's doctors and therapists," Ragan asked the trial court to deny Muehlfeld any access to Z.J.M.A. or to require that all visits be supervised. The petition also requested an increase in child support.

On January 11, 2018, the parties executed a handwritten agreement providing that Muehlfeld would have gradually increasing access to the child, beginning with three weekly supervised visits with the child's therapist, continuing with four weekly two-hour unsupervised visits, then four weekly six-hour unsupervised visits, and finally weekly overnight unsupervised visits. On April 17, 2018, the trial court rendered temporary orders largely tracking the parties' handwritten agreement, but providing that the three supervised visits would take place at KidShare, a private visitation facility, rather than at the therapist's office.

Muehlfeld filed an answer and counterpetition on July 31, 2019, in which he agreed that "[t]he circumstances of the child, a conservator, or other party affected by the order to be modified have materially and substantially changed since the date of rendition of

3

the order to be modified." Muehlfeld asked to be named joint managing conservator with the right to determine Z.J.M.A.'s residence, or in the alternative, for a standard possession order. In an amended answer and counterpetition, Muehlfeld withdrew his request for the right to determine Z.J.M.A.'s residence.

On August 29, 2019, Ragan filed a "Motion to Inspect Residence" stating that she "has not seen or is aware of the residence or living conditions of [Muehlfeld]" because Muehlfeld "has been absent for the past four (4) years." Later, Ragan filed a "Motion for Child Custody Evaluation" alleging that Muehlfeld "abandoned the child since she was approximately 6 months of age." The trial court denied the motion for custody evaluation.

At a status hearing on September 5, 2019, Ragan's counsel informed the trial court that Muehlfeld agreed to relinquish his parental rights, and that Muehlfeld's counsel "assure[d] me that they are not going to change their mind." Muehlfeld's counsel acknowledged that her client intended to relinquish his rights; however, no signed affidavit for relinquishment of parental rights appears in the record. Instead, a final hearing on modification took place on February 18 and 19, 2020.

## B. Final Hearing

### 1. Ragan

At the hearing, Ragan testified that she has been married to Jeremy Ragan for three years, that she has one other child with Jeremy who is around two years old, and that they are expecting another child in June of 2020. She said she is not currently employed but previously worked at Costco and intended to return to work there "[a]fter my kids go to school."

Ragan stated that she was married to Muehlfeld for about two years, but they

4

separated in September of 2014. She stated that she had been the victim of domestic violence by Muehlfeld "throughout the marriage," and for that reason, they agreed even before the child was born that Muehlfeld's visits would be supervised. One Sunday afternoon in April of 2015, when Z.J.M.A. was about two and a half months old, Muehlfeld walked into the backyard with the child, and when they came back, the child was "crying and kicking and screaming." Muehlfeld handed the child back to Ragan and left the house. Ragan also said that, when changing the child's diaper, Muehlfeld would take too long and the child "would appear red afterwards."

Ragan testified that, from June 2015 to February 2017, Muehlfeld did not see the child and did not contact her to ask about the child. She later clarified that, around Christmas of 2015, Muehlfeld asked Ragan for "a picture to take home." Ragan said she texted the picture to him and asked him if he wanted to see his daughter, since he had not originally asked to see her. Muehlfeld told Ragan that he did want to see Z.J.M.A. and a visit was arranged; however, when the visit took place, the child "started screaming hysterically" after "45 seconds." Ragan said that, after this brief visit, Z.J.M.A. began "her regressive tendencies" such as "overeating" and "not being able to sleep," and the pediatrician recommended therapy. Z.J.M.A. underwent therapy for "[a]bout six months" before being discharged.[2]

Ragan said that in February 2017, Muehlfeld contacted her to explain that he was applying for a law enforcement job and that Ragan would be contacted in connection with

---

[2] On cross-examination, Ragan acknowledged that Z.J.M.A. was discharged from therapy in April 2017 "because of an escalated event." When asked to elaborate, Ragan stated that "they locked my mother away from me and I needed to leave the room and would not allow her near me . . . ." Later, the director of the therapy facility testified that "the maternal grandparents got involved and became angry and hostile; therefore, we could not continue to provide services." However, according to a July 6, 2017 "Closure Summary Report" signed by the director, Z.J.M.A. "successfully met all of her treatment goals."

the application; he did not ask about Z.J.M.A. at that time. Later in February, Muehlfeld "showed up" at the residence Ragan was living at with her parents to exercise visitation with the child. Ragan testified that the child "immediately ran behind the counter and hid from [Muehlfeld]," and despite "multiple [attempts] to coax her out," she "refused to leave behind the kitchen counter until he was gone," after about an hour. According to Ragan, Muehlfeld exercised about ten other visits with Z.J.M.A. from February to September 2017, but most of the time, the child would "run and hide from him." Ragan said Muehlfeld did not hold or touch the child during any of the visits. Ragan testified that, on several of these visits, she had to call the police because Muehlfeld "would make inappropriate comments or would try to challenge my dad, and a couple times he actually got up in my dad's face, and then he would start yelling at my mother, all while in front of the child."

Ragan said that, after Muehlfeld's visits, Z.J.M.A. would "overconsum[e] bottles," would have difficulty sleeping, would wet her bed, and would have night terrors. Therefore, Ragan again sought out therapy for the child around August of 2017. Z.J.M.A. saw therapist Shannon Zorn from that time until around August of 2019.

Ragan testified that Muehlfeld saw Z.J.M.A. three times in 2018. First, he visited with her at Zorn's office, pursuant to the parties' January 11, 2018 handwritten agreement. According to Ragan, when Z.J.M.A. looked into Zorn's office and saw Muehlfeld there, the child "turned back around and ran down the hallway crying." After multiple entreaties, Z.J.M.A. eventually entered the office and stayed there for about ten minutes, but she did not make eye contact with Muehlfeld or communicate with him. Ragan said that, at Z.J.M.A.'s next individual counseling appointment with Zorn, the child would not enter the waiting room and "was checking around for [Muehlfeld]." On May 23, 2018, Ragan took

6

Z.J.M.A. to KidShare for a scheduled visit with Muehlfeld. Ragan said this visit "went okay" but the child expressed that she did not want to go back the following week. On May 30, 2018, Ragan again took Z.J.M.A. to KidShare even though the child was "hysterical" and "didn't want to go." Ragan said that Z.J.M.A. "seemed okay" after this visit—however, over the following days, the child refused to leave the house and refused to go to the bathroom. Instead, she would "pee in her underwear right in the living room." Ragan testified that she later learned Muehlfeld was alone in the restroom with the child during the May 30 visit. According to Ragan, her attorney has since made multiple efforts to set up a visit for Muehlfeld with Ragan and the therapist present; however, Muehlfeld has rejected those efforts. She said the May 30, 2018 visit was the last time Z.J.M.A. was physically in Muehlfeld's presence.

Ragan testified that Z.J.M.A. later saw a different therapist, Cori Callaghan, until October of 2019. According to Ragan, at the time of the hearing, Z.J.M.A. "is a happy, healthy five-year-old," is "on scale for her weight" and is "doing great" in preschool. Ragan asked that the court modify the decree to grant Muehlfeld "supervised, restricted access" to Z.J.M.A., to increase Muehlfeld's monthly child support obligation, and to direct Muehlfeld to pay for health insurance for the child. Ragan opined that any sort of overnight or extended visitation with Muehlfeld would be detrimental to the child.

Ragan said she was concerned that, if Muehlfeld were to be granted standard possession, "he will work on alienating me" or "he might take her out of state and I'll never get her back." She asked the court to order supervised visitation only, with a supervisor "experienced in reunification," until "we [can] make sure that [Z.J.M.A.] is willing and happy to go with him."

7

On cross-examination, Ragan conceded that, in the letters offering Muehlfeld visitation after May 30, 2018, she demanded Muehlfeld agree to strict rules, including that he would only be allowed to hold the child for thirty minutes out of the hour-long visit, and he had to put the child in her bassinet if she fell asleep. Ragan explained "infants need to know that there are places to play and places to sleep. Hold an infant all the time, as a lot of people tell you about your kid, that's what they're going to get used to." Further, she asked Muehlfeld to refrain from calling himself "dad" until she "could work with her therapist to get her to understand that." She acknowledged that Z.J.M.A. has seen at least four therapists during the course of the case.

Ragan initially could not recall whether she asked Muehlfeld to relinquish his parental rights. Muehlfeld's counsel then offered as evidence an audio recording of a March 19, 2017 phone call between Ragan and Muehlfeld. During the phone call, Ragan stated: "I would like it if you would go ahead and terminate your rights and get the money situation out of our hands, away from us. If you do that, you and I can actually start a co-parenting relationship. No more supervisors involved. You and me trying to figure this out." Ragan explained to Muehlfeld that she wants Z.J.M.A. to have a relationship with him and his family, "[b]ut I can't do that and I haven't been able to do that with you being able to just pop in whenever you feel like it" because "it has this [n]egative [e]ffect on her." Muehlfeld said he would "think about it."

### 2. Muehlfeld

Muehlfeld testified that he is employed as a lead officer for a security company, works forty hours per week, and earns $16.90 per hour. He has been married since 2016

and lives in a two-bedroom apartment in San Antonio.[3] He stated he owns a handgun and two knives which he keeps in the apartment "high up, unable to be reached by children."

Muehlfeld denied that Z.J.M.A. became "hysterical" when he took her out to the backyard in April of 2015, and he denied that he dropped the child then or any other time. He denied that he ever committed domestic violence against Ragan. He said he has twice been investigated by Child Protective Services (CPS) with regard to Z.J.M.A., but there has never been a "reason to believe" finding made about any wrongdoing. CPS did not institute a safety plan, did not advise him to take parenting classes, and did not recommend that he have supervised visitation with the child.

Muehlfeld opined that the initial supervised visits in 2017 "didn't go wrong because of my visitation" but instead "went wrong because of how they introduced the daughter and how my ex-wife and her husband refused to give her space to be able to . . . interact." Muehlfeld conceded that he asked Ragan's counsel to prepare an affidavit of relinquishment of parental rights, but he claimed he did that only "[t]o find out what it looked like, what it was, what it entailed." He denied that he wanted to relinquish his rights to Z.J.M.A., and he denied knowing that Ragan's husband wanted to adopt the child.

Muehlfeld testified that, when he visited Z.J.M.A. in the first few months of her life, Ragan's father would demand that Muehlfeld turn his pockets inside-out to prove he was not carrying a cell phone or recording device. He said Ragan and her parents would not allow him to touch the child and would not allow him to call himself her father.

---

[3] Muehlfeld said his wife lives with him; however, he refused to testify as to what her job is or where she is employed.

9

According to Muehlfeld, at his visit with Z.J.M.A. at KidShare on May 30, 2018, the child was playing and "all of a sudden she became very [sic] really fussy and started crying. And I asked her: Did you need to go potty? And she goes yes. I said: Okay, let's go ahead and go potty." Muehlfeld testified:

> We went over to the restroom. I went in with her. The door was ajar and the counselor was standing there watching the whole thing.
>
> You know, I asked [Z.J.M.A.] did you need any help pulling down her pants or getting on the toilet, and she goes: No, I got it. And she pulled down her pants and then she tried to climb up the toilet and she couldn't do it.
>
> And I said: Can I help you? And I helped her up on the toilet, she used the bathroom, I pulled out some toilet paper for her, I asked her if she was done, I helped her off the toilet, I handed her the toilet paper, she then wiped, pulled up her own pants, and then I lifted her up to wash her hands, we went back to the room and we continued playing.

Muehlfeld acknowledged that his attorney advised him of the various letters sent by Ragan's counsel proposing additional supervised visits in 2018; he agreed that he rejected those proposals because "they were 10 minutes long" and "10 minutes is an insult."[4] He stated that he would like to start unsupervised visitation "right away," on the same schedule as provided in the divorce decree, but he understood "that may not be the case because of the alienation that's happened."

### 3. Other Witnesses

Zorn, a licensed marriage and family therapist, testified she first saw Z.J.M.A. in May of 2017 because the child was having sleeping and bedwetting issues. She first met Muehlfeld in January of 2018 during his "therapeutic" visit with the child. Zorn said that Muehlfeld was in a play therapy room when Z.J.M.A. entered, and the child ran back to

---

[4] According to emails between the parties' attorneys, the proposed supervised visits would have been 15 minutes in duration.

Ragan and her husband and refused to go in. Zorn said that Ragan and her husband repeatedly tried to get the child to go into the room. Eventually, Z.J.M.A. calmed down and Ragan's husband carried her back to the therapy room. After that visit, Zorn's employer referred the family to KidShare for supervised visits, while Zorn continued to counsel Z.J.M.A. individually.

Zorn testified as follows with respect to an individual counseling session she had with the child on September 14, 2018:

| [Zorn:] | [Ragan] had mentioned that since the last counseling session she had just a week or so prior, that [Z.J.M.A.] had two visits at KidShare and on top of that she was still bedwetting, requesting more bottles at night. So some of the same behaviors were still going on. And that [Z.J.M.A.] had expressed not wanting to go to KidShare. Ms. Ragan had asked if I could ask [Z.J.M.A.] about her visits, and so I said sure, I can try and see what comes of it. |
|---|---|
| | So I met with [Z.J.M.A.], we had our normal play therapy session. Towards the end of the session, maybe about 15, 20 minutes before we ended, I asked [Z.J.M.A.], I said: Can I ask you a question? She said sure. And I asked her: Do you know of a man named Eric and have you seen him? And she said yes. |
| | She then proceeded to describe a situation where there was a green car, a car seat and her falling out of the car seat. And then she proceeded to say: He's mean, kicked me. So she makes a kicking gesture, and that he punched me. And she shows me a gesture like this. (Indicating) |
| [Ragan's counsel:] | For the record, you're taking your fists and punching towards your stomach . . . |
| [Zorn:] | Right. And so after that she proceeded to say something else that was not very clear, I wasn't able to understand, decipher, and then said: It's driving me crazy. |

Zorn said she made a report to CPS concerning this allegation, as was her legal duty.

She said this was the last time she had a counseling session with Z.J.M.A.

David Cantu, a licensed clinical social worker, testified that he met with Ragan, Ragan's husband, and Z.J.M.A. on January 15, 2020. At the session, Cantu asked the child to draw pictures and to explain why she drew what she drew; he then wrote notes on each drawing reflecting what the child told him. Over Muehlfeld's counsel's objection, the drawings with the notes were entered into evidence. The first drawing is of Muehlfeld and the notes state: "Mad, scared, pushed me off the couch because that is what they do." The second drawing is of Muehlfeld and the child, and the notes state: "Door fall on them." The third drawing depicted Muehlfeld, Z.J.M.A., and other people; all the people had smiles on their faces except Muehlfeld. The notes on the drawing state: "Eric drop me and let me fall. Playing in a big house w/ a block castle." Cantu stated he was concerned for Z.J.M.A.'s safety and her relationship with Muehlfeld[5] because "she became angry and scared" during his visit with her and, in his opinion, the prior court orders "ignored the well-being of the child" in setting forth steps toward reunification. Cantu agreed that, "if there is some issue, the counselor needs to work through it and not just force the child to go right back to the visit."

---

[5] Ragan's counsel led Cantu through § 107.108(f) of the family code, which provides:

A child custody evaluator who has evaluated only one side of a contested suit shall refrain from making a recommendation regarding conservatorship of a child or possession of or access to a child, but may state whether any information obtained regarding a child's placement with a party indicates concerns for:
    (1) the safety of the child;
    (2) the party's parenting skills or capability;
    (3) the party's relationship with the child; or
    (4) the mental health of the party.

TEX. FAM. CODE ANN. § 107.108(f).

## C.     Judgment and Findings

The trial court's judgment, signed on August 21, 2020, states as follows:

The Court finds that the allegations in the Petition to Modify Parent-Child Relationship have merit and that the modifications requested by ERIC MUEHLFELD are in the best interests of the child. Accordingly, IT IS ORDERED that the Petition to Modify Possession and Access is GRANTED.

The Court finds that the allegations in the Petition to Modify Parent-Child Relationship have merit and that the modifications requested by CHRISTINA ALEXANDER RAGAN are in the best interests of the child. Accordingly, IT IS ORDERED that the Petition to Modify Child Support and Medical Support is GRANTED.

The judgment ordered standard visitation for Muehlfeld, as provided in the divorce decree, but provided that "a parenting facilitator," namely Danielle Warzecha, "will supervise the first six visits." The judgment states that the supervised visits may be at Muehlfeld's residence or any other place he and Warzecha agree, and that Muehlfeld's wife may be present during the visits. It further stated that Ragan shall pay Warzecha's fees and "shall facilitate the visits in a manner which positively enhances and prepares [Z.J.M.A.] for standard possession." Finally, the judgment increased Muehlfeld's child support obligation to $550 per month, awarded Muehlfeld $7,800 in attorney's fees and expenses, and denied Ragan's request for attorney's fees. The judgment did not address conservatorship.

In findings of fact and conclusions of law filed on October 13, 2020, the trial court reiterated the findings contained in the judgment and specified that "[t]he parties are named Joint Managing Conservators of [Z.J.M.A.]," with "[Ragan] to determine residence." It concluded that "[t]here is no credible evidence to support the denial of this father's normal and unfettered access to his child under the guidelines of joint managing conservatorship."

13

This appeal followed.[6]

## II.   DISCUSSION

## A.   Custody Evaluation

By her first issue on appeal, Ragan argues that the trial court erred by denying her motion for custody evaluation.

A trial court in a custody suit may, after notice and hearing or by agreement of the parties, order the preparation of a child custody evaluation. TEX. FAM. CODE ANN. § 107.103. The appointed evaluator must meet minimum educational and training requirements. *Id.* § 107.104. In order to opine on conservatorship, the evaluator generally must complete certain basic elements, including a personal interview of each party seeking conservatorship and observations of the child in the presence of each party. *Id.* § 107.109(a), (c). We review a trial court's ruling on a motion under § 107.103 for abuse of discretion. *See Swearingen v. Swearingen*, 578 S.W.2d 829, 831 (Tex. App.—Houston [1st Dist.] 1979, writ dism'd) (applying abuse of discretion standard to the decision not to order a social study under former family code § 107.051); *see also McKinney v. Davis*, No. 13-06-00163-CV, 2007 WL 925649, at *2 (Tex. App.—Corpus Christi–Edinburg Mar. 29, 2007, no pet.) (mem. op.) (same). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or without reference to guiding rules or principles. *Samlowski v. Wooten*, 332 S.W.3d 404, 410 (Tex. 2011).

Ragan argues that an evaluation was in Z.J.M.A.'s best interests because Muehlfeld "abandoned the child since she was 6 months of age" and because, at the time of the motion, Z.J.M.A. had been in therapy for over a year, allegedly due to her reactions

---

[6] Muehlfeld has not filed a brief to assist us in the resolution of this appeal.

to Muehlfeld's visits. She contends that an evaluation under § 107.103 could have allowed a "professional" "expert" to make recommendations at the final hearing as to what provisions concerning access and possession would be in Z.J.M.A.'s best interests. She does not cite any authority establishing that a trial court lacks discretion to decline to order a custody evaluation in cases where a child has been abandoned or is undergoing therapy. Instead, the only authorities Ragan cites are *Swearingen* and *McKinney*, both of which found that there was no abuse of discretion in declining to order a social study because no party requested one. *See Swearingen*, 578 S.W.2d at 831; *McKinney*, 2007 WL 925649, at *2; *see also* TEX. R. APP. P. 38.1(i).

On this record, we cannot conclude that the trial court reversibly erred. There was no hearing held on Ragan's motion, and the record does not otherwise reflect the reasons for the trial court's ruling. Ultimately, there was ample testimony adduced at the final hearing from witnesses who personally observed the parties interact with the child, as well as from the parties themselves. *See* TEX. FAM. CODE ANN. § 107.109(a), (c) (listing required elements of custody evaluation); *In re Garza*, 981 S.W.2d 438, 442 (Tex. App.—San Antonio 1998, orig. proceeding) (concluding that the trial court "did not abuse his discretion in refusing to order an updated social study" because "[i]t is within the trial court's discretion to order a social study"); *see also In re Villanueva*, 292 S.W.3d 236, 243 (Tex. App.—Texarkana 2009, no pet.) (noting that "while the trial court must make the determination of the best interest of the child, there is no evidence that, without the social study, the trial court will be unable to make such determination" and that "the social study could be necessary and would likely be helpful but, ultimately, we cannot know whether the social study is necessary to allow the trial court to make its determination as to the

15

best interest of the children"). Though Ragan suggests that a custody evaluation would have allowed the trial court to better determine which possession arrangement would be in Z.J.M.A.'s best interests, she does not explicitly argue as part of this issue that the lack of an evaluation probably caused the trial court to render an improper judgment or probably prevented her from presenting her case to this Court. *See* TEX. R. APP. P. 44.1(a) (standard for reversible error in civil cases).

For the foregoing reasons, we overrule Ragan's first issue.

## B.    Conclusions of Law

By her second through twelfth issues, Ragan argues that the trial court erred in making various conclusions of law.

### 1.    Standard of Review

We review a trial court's conclusions of law de novo, evaluating them independently and determining whether the court correctly drew the legal conclusions from the facts. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *see In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009). Conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence. *Mack v. Landry*, 22 S.W.3d 524, 528 (Tex. App.—Houston [14th Dist.] 2000, no pet.); *see Stable Energy, L.P. v. Newberry*, 999 S.W.2d 538, 547 (Tex. App.— Austin 1999, pet. denied) ("Incorrect conclusions of law will not require reversal if the controlling findings of facts will support a correct legal theory.").

The trial court is afforded great discretion when determining issues relating to conservatorship, including visitation. *Gardner v. Gardner*, 229 S.W.3d 747, 753–54 (Tex. App.—San Antonio 2007, no pet.); *Dennis v. Smith*, 962 S.W.2d 67, 70 (Tex. App.—

16

Houston [1st Dist.] 1997, pet. denied). To determine whether the trial court abused its discretion, we review the "evidence in a light most favorable to the court's decision and indulge every legal presumption in favor of its judgment." *In re J.I.Z.*, 170 S.W.3d 881, 883 (Tex. App.—Corpus Christi–Edinburg 2005, no pet.). In this context, challenges to the legal or factual sufficiency of the evidence are not separate grounds of error, but instead are relevant factors to consider in assessing whether the trial court abused its discretion. *In re R.T.K.*, 324 S.W.3d 896, 899 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). To determine whether the trial court abused its discretion because the evidence was legally or factually insufficient, "we consider whether the trial court had sufficient information upon which to exercise its discretion and whether it erred in its application of that discretion." *In re M.M.M.*, 307 S.W.3d 846, 849 (Tex. App.—Fort Worth 2010, no pet.).

We are mindful that "the trial judge is best able to observe and assess the witnesses' demeanor and credibility, and to sense the 'forces, powers, and influences' that may not be apparent from merely reading the record on appeal." *In re P.M.G.*, 405 S.W.3d 406, 410 (Tex. App.—Texarkana 2013, no pet.) (quoting *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.)). Thus, we "defer to the trial court's judgment in matters involving factual resolutions and any credibility determinations that may have affected those resolutions." *Id.*

### 2. Joint Managing Conservatorship

Ragan contends by her second issue that the trial court's conclusion of law regarding joint managing conservatorship was erroneous because it conflicts with the prior written judgment. Ragan notes that the divorce decree named her as Z.J.M.A.'s sole

17

managing conservator and that the judgment on appeal, though silent on the issue of conservatorship, states that "any provisions [of the divorce decree] not modified remain in full force and affect [sic] until otherwise modified by Court Order." Ragan argues that, because the August 21, 2020 judgment did not alter the conservatorship provisions of the divorce decree, those provisions remain in force.

We disagree. Absent an objection, findings of fact and conclusions of law filed after a judgment are controlling if they conflict with a previous judgment. *In re R.J.P.*, 179 S.W.3d 181, 184 n.3 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *Capital Senior Mgmt. 1, Inc. v. Tex. Dep't of Human Services*, 132 S.W.3d 71, 74 n.3 (Tex. App.—Austin 2004, pet. denied); *Zorilla v. Wahid*, 83 S.W.3d 247, 254 (Tex. App.—Corpus Christi–Edinburg 2002, no pet.), *disapproved on other grounds by Iliff v. Iliff*, 339 S.W.3d 74 (Tex. 2011). Indeed, "[w]hen an appellate court is presented with a conflict between a judgment and subsequent findings and conclusions, the appellate court has the power to modify the judgment to conform with the findings of fact and conclusions of law." *City of Laredo v. R. Vela Exxon, Inc.*, 966 S.W.2d 673, 678 (Tex. App.—San Antonio 1998, pet. denied); *see Arena v. Arena*, 822 S.W.2d 645, 652 (Tex. App.—Fort Worth 1991, no writ).

Here, the written judgment arguably implied that Ragan remained Z.J.M.A.'s sole managing conservator, but the conclusions of law explicitly provided that the parties are joint managing conservators. The latter conclusion controls. *See In re R.J.P.*, 179 S.W.3d at 184 n.3; *Capital Senior*, 132 S.W.3d at 74 n.3; *Zorilla*, 83 S.W.3d at 254. Accordingly, on our own motion, we will modify the judgment to reflect that the parties have both been named joint managing conservators of Z.J.M.A. *See* TEX. R. APP. P. 43.2(b). Ragan's second issue is overruled.

By her ninth issue, Ragan argues that the trial court erred by designating Muehlfeld a joint managing conservator because he did not "pursue" such relief at the final hearing. She cites no authority, and we find none, stating that a party must orally request certain relief at a final hearing or trial in order to be entitled to that relief. *See* TEX. R. APP. P. 38.1(i). Here, the designation of Muehlfeld as joint managing conservator was supported by Muehlfeld's live pleading, in which he explicitly asked "to be appointed the Joint Managing Conservator of the child . . . ." *See* TEX. R. CIV. P. 301 (providing that "[t]he judgment of the court shall conform to the pleadings"); *see also Cunningham v. Parkdale Bank*, 660 S.W.2d 810, 813 (Tex. 1983) ("[A] party may not be granted relief in the absence of pleadings to support that relief."); *In re Park Mem'l Condo. Ass'n, Inc.*, 322 S.W.3d 447, 450–51 (Tex. App.—Houston [14th Dist.] 2010, orig. proceeding). We overrule this issue.

### 3.    Possession and Access

Ragan's remaining challenges to the trial court's conclusions of law concern the provisions setting forth Muehlfeld's periods of possession of Z.J.M.A.

By her third and fourth issues, she contends that the trial court erred in stating in Conclusion of Law No. 1 that (1) the allegations in Muehlfeld's petition have merit, (2) the allegations in Ragan's petition have merit, (3) Muehlfeld's "Petition to Modify Access and Possession is granted," and (4) Ragan's "Petition to Modify Child Support and Medical Support is granted." These issues appear to be based on the fact that the parties did not file pleadings with the exact names recited in the judgment and in Conclusion of Law No. 1. Instead, Muehlfeld's request for modification to access and possession was included within his "Amended Original Answer and Counterpetition to Modify Parent-Child

Relationship"; and Ragan's request to modify child support was contained in her "Petition to Modify Parent-Child Relationship." Ragan does not explain how this discrepancy probably caused the rendition of an improper judgment or probably prevented her from presenting her appeal. *See* TEX. R. APP. P. 44.1(a). Her third and fourth issues are overruled for that reason.

Within her discussion of issues three and four, Ragan argues the trial court abused its discretion by failing to explicitly find a material and substantial change in circumstances since the divorce decree.[7] However, she does not reference any legal authority in support of this argument. Accordingly, the issue is waived. *See* TEX. R. APP. P. 38.1(i). In any event, we note that Ragan did not object, by a motion for new trial or otherwise, to the trial court's failure to explicitly find a material and substantial change in circumstances. *See* TEX. R. APP. P. 33.1(a)(1) (general rule for error preservation); *In re P.M.G.*, 405 S.W.3d at 410 n.2. And here, a finding of a material and substantial change in circumstances may be implied from the trial court's judgment because such a finding was supported by the evidence. *See* TEX. R. CIV. P. 299 (noting that, when one or more elements of a ground of recovery "have been found by the trial court, omitted unrequested elements, when supported by evidence, will be supplied by presumption in support of the

---

[7] Generally, a court may modify an order affecting the parent-child relationship only if modification would be in the best interest of the child and:

> the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since the earlier of:
>
> (A)    the date of the rendition of the order; or
>
> (B)    the date of the signing of a mediated or collaborative law settlement agreement on which the order is based . . . .

TEX. FAM. CODE ANN. § 156.101(a)(1). The trial court's August 21, 2020 order and its Conclusion of Law No. 1 both generally state that the allegations in the parties' pleadings "have merit," but they do not explicitly state that there has been a material and substantial change in circumstances since the divorce.

judgment"); *In re H.N.T.*, 367 S.W.3d 901, 904 (Tex. App.—Dallas 2012, no pet.). Both parties alleged in their pleadings that there had been a material and substantial change in circumstances since the divorce decree, and the evidence adduced at trial almost entirely concerned events which took place after the decree was rendered. Ragan does not argue on appeal that the evidence was insufficient to support this implied finding. We overrule this unenumerated issue.

Ragan raises several issues challenging the trial court's central ruling in this case—i.e., its determination that Muehlfeld shall have six supervised visits with Z.J.M.A. before beginning standard unsupervised visitation. Her fifth issue argues the trial court abused its discretion by making this ruling; her sixth issue argues the evidence was factually insufficient to support the ruling; her seventh issue argues there was no evidence to support Conclusion of Law No. 3, which reiterated the ruling; and her eighth issue argues the ruling was not in Z.J.M.A.'s best interests. Ragan's tenth through twelfth issues concern the trial court's conclusion that "[t]here is no credible evidence to support the denial of this father's normal and unfettered access to his child under the guidelines of joint managing conservatorship." Her tenth issue argues this conclusion was supported by factually insufficient evidence; her eleventh issue argues the conclusion was erroneous; and her twelfth issue argues there was no evidence to support the conclusion. We address these issues together.

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." TEX. FAM. CODE ANN. § 153.002; *see In re Marriage of Christensen*, 570 S.W.3d 933, 938 (Tex. App.—Texarkana 2019, no pet.). In determining the best interests of the child,

courts may consider the following factors: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by the individuals seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). "Proof of best interest is not limited to these factors, nor do all factors always apply in every case." *In re S.A.H.*, 420 S.W.3d 911, 926 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

As to the first *Holley* factor, the evidence established that throughout 2017 and 2018, Z.J.M.A. resisted attending visits with Muehlfeld at Ragan's parents' house, at Zorn's office, and at KidShare. However, the child was too young at that time to have credibly stated her desires. As to the second factor, the evidence showed that Z.J.M.A. had problems with eating, sleeping, and bedwetting after her visits with Muehlfeld, for which she underwent extensive therapy.

As to the third, fourth and eighth factors—concerning danger to the child, parenting abilities, and the nature of the parent-child relationship—Ragan suspected that Muehlfeld physically injured Z.J.M.A. as an infant, when he took her to the backyard of her parents' house in 2015. Ragan also accused Muehlfeld of improperly changing the child's diaper, and she believed, based on Z.J.M.A.'s reaction over the following several days, that Muehlfeld acted improperly while taking the child to the bathroom during the May 30, 2018

22

visit at KidShare. Finally, according to Zorn, Z.J.M.A. reported that Muehlfeld "kicked" and "punched" her. However, Muehlfeld denied that he physically mistreated the child on any occasion, and the trial court was entitled to believe those denials. *See In re P.M.G.*, 405 S.W.3d at 410.

Also relevant to the eighth *Holley* factor is Ragan's request for Muehlfeld to voluntarily relinquish his parental rights, and Muehlfeld's consideration of that request. In the phone call introduced as evidence, Ragan explained to Muehlfeld that she wanted him to relinquish his rights because his unannounced visits had a "[n]egative [e]ffect" on Z.J.M.A., though she claimed she would still allow him to visit with the child even if his rights were terminated. The trial court could have concluded from this evidence that Ragan did not want Muehlfeld to have legally-enshrined visitation rights; and it could have further concluded that, without a direct path to standard unsupervised possession, Ragan would resist facilitating regular visits between Z.J.M.A. and her father. It is important to note that neither the divorce decree, nor the temporary orders, nor the final judgment in this case allow Muehlfeld to make unannounced visits.

Ragan argues that "there was absolutely no evidence or testimony of either a substantive or probative character" to support the trial court's decision to order six four-hour supervised visits followed by standard unsupervised visitation. She emphasizes that no witness explicitly testified that this particular arrangement was in Z.J.M.A.'s best interests. However, "[i]t is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child." TEX. FAM. CODE ANN. § 153.131(b). Though "[a] finding of a history of family violence involving the parents of a child removes" that presumption, *id.*, the trial court made no such finding in

this case; and as noted, the court was within its discretion to credit Muehlfeld's testimony that he did not physically mistreat Z.J.M.A. Moreover, there is a rebuttable presumption that a standard possession order is in the best interest of the child, regardless of whether the parent is named possessory or managing conservator. *Id.* § 153.252.[8]

Considering all the evidence in this case in the light most favorable to the judgment, we cannot say the trial court abused its discretion in naming the parties joint managing conservators and ordering six supervised visits before a standard possession order would take effect. The trial court evidently did not believe that Muehlfeld presented a physical danger to Z.J.M.A., and there was no evidence from which the court could have concluded that Muehlfeld's living arrangements were unsuitable for the child to have regular visits. Ragan's evidence—which she claims supports an order requiring supervised visits on a permanent basis—primarily concerned Z.J.M.A.'s reactions to seeing Muehlfeld as well the child's "regressive" behavioral "tendencies" which occurred after the visits. Specifically, Z.J.M.A. "started screaming hysterically" at a visit in 2015; she hid from Muehlfeld for an hour at a visit in 2017; she turned around and ran away crying at the first visit in 2018 at Zorn's office; and she did not want to go to the second visit at KidShare. Cantu testified that he was "concerned" about Z.J.M.A.'s safety and her relationship with Muehlfeld because of the child's reactions to his visits. However, while Ragan casts doubt on Muehlfeld's parenting abilities, the court could have found from the evidence that Muehlfeld did not act inappropriately in any of the various supervised visitation settings.

---

[8] If the trial court orders a possession arrangement that varies from the standard possession order, it must "state in writing the specific reasons for the variance" upon a party's request. *Id.* § 153.258. Though Ragan generally requested findings of fact and conclusions of law, no party specifically requested the trial court to state its reasons for varying from the standard possession order, and the court's findings and conclusions do not contain such specific reasons.

The parties in this case have made commendable efforts to ensure that Z.J.M.A. has a healthy, meaningful relationship with her father. And this Court is certain that Ragan's actions throughout the case have been motivated by genuine concern for the well-being of the child. But that does not mean it is in the child's best interest for her to have only supervised contact with Muehlfeld indefinitely. Simply put, the fact that the child had minor behavioral difficulties following visits does not, by itself, rebut the presumption that a standard possession order would be in the child's best interests. *See* TEX. FAM. CODE ANN. § 153.252. Here, the trial court ordered six four-hour supervised visits, to take place over at least two months, before the standard possession order takes effect. We conclude that the trial court did not err in concluding that such an arrangement is in Z.J.M.A.'s best interests. We overrule Ragan's fifth through eighth and tenth through twelfth issues.

## C.     Parenting Facilitator

Ragan raises seven issues concerning the trial court's appointment of Warzecha as a "parenting facilitator" tasked with supervising Muehlfeld's first six visits with Z.J.M.A. By issue thirteen in particular, Ragan contends that the court erred by making the appointment without holding a hearing or making necessary findings under family code § 153.6051(b).

A trial court in a suit affecting the parent-child relationship may, on its own motion or on a motion or agreement by the parties, appoint a parenting facilitator. TEX. FAM. CODE ANN. § 153.6051(a). However, the court

> may not appoint a parenting facilitator unless, after notice and hearing, the court makes a specific finding that: (1) the case is a high-conflict case or there is good cause shown for the appointment of a parenting facilitator and the appointment is in the best interest of any minor child in the suit; and (2)

25

the person appointed has the minimum qualifications required by Section 153.6101, as documented by the person.

*Id.* 153.6051(b). Here, there is no indication that a hearing was held before the trial court made the appointment. Moreover, though the judgment states that Warzecha meets the minimum qualifications required by § 153.6101, neither the final judgment nor the findings of fact and conclusions of law state that "the case is a high-conflict case,"[9] that there is good cause for the appointment of a facilitator, or that the appointment of a facilitator is in Z.J.M.A.'s best interest. *See id.* Accordingly, the trial court erred by appointing a parenting facilitator in this case. Ragan's thirteenth issue is sustained.[10]

We emphasize that we do not disturb the trial court's rulings: (1) that Muehlfeld's first six four-hour visits with Z.J.M.A. shall be supervised, and (2) that Ragan shall pay the supervisor's costs.

## D.     Attorney's Fees and Expenses

Ragan's final two issues concern the trial court's rulings on attorney's fees and expenses. By her twentieth issue, she contends there was no evidence to support the award of $7,800 in fees and expenses to Muehlfeld. By her twenty-first issue, she contends the trial court erred by failing to award fees to her.

A trial court in a suit affecting the parent-child relationship (SAPCR) has "general discretion" to render judgment for reasonable attorney's fees and expenses. *Tucker v. Thomas*, 419 S.W.3d 292, 296 (Tex. 2013) (citing TEX. FAM. CODE ANN. § 106.002(a) ("In

---

[9] A "high-conflict case" is defined as "a suit affecting the parent-child relationship in which the court finds that the parties have demonstrated an unusual degree of: (A) repetitiously resorting to the adjudicative process; (B) anger and distrust; and (C) difficulty in communicating about and cooperating in the care of their children." *Id.* § 153.601(2).

[10] In light of our conclusion, we need not address Ragan's other issues concerning the appointment of a parenting facilitator. *See* TEX. R. APP. P. 47.1.

a [SAPCR], the court may render judgment for reasonable attorney's fees and expenses and order the judgment and postjudgment interest to be paid directly to an attorney."); *Lenz v. Lenz*, 79 S.W.3d 10, 21 (Tex. 2002)). An award of attorney's fees must be supported by evidence that the fees are reasonable and necessary. *See Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 484 (Tex. 2019). The reasonableness of attorney's fees is a question of fact, and an appellate court may not substitute its judgment for that of the factfinder. *Guimaraes v. Brann*, 562 S.W.3d 521, 551 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

At the final hearing, Ragan's counsel testified that he has practiced law in Texas since 1973 and has been board certified in family law since 1979. He introduced billing records indicating that Ragan paid a $10,000 retainer and that he billed $10,560 in additional necessary services since the beginning of the case. He testified that his hourly billing rate of $450 was a reasonable fee for his services.

Muehlfeld's counsel testified that she has practiced law since 1994, primarily in family law. She stated that she charged her client a "flat fee" of $5,500; had "subpoena expenses of $800"; a "mediation fee of $800"; and an "expert fee from KidShare of $300." Counsel stated that the total amount of $7,400 is fair and reasonable for Guadalupe County. On cross-examination, she acknowledged that the mediation fee was $650 per party. Counsel offered into evidence a contract reflecting that her billing rate was $300 per hour "if services are discontinued prior to completion."

This evidence supported an award of no more than $7,250 in reasonable attorney's fees and expenses to Muehlfeld. *See* TEX. FAM. CODE ANN. § 106.002(a); *Diaz v. Diaz*, 350 S.W.3d 251, 257 (Tex. App.—San Antonio 2011, pet. denied) (noting that expert

witness fees are "expenses" recoverable in a SAPCR under § 106.002). We sustain Ragan's twentieth issue in part and modify the judgment to reflect that Muehlfeld shall recover $7,250 in attorney's fees and expenses from Ragan in the form and method provided in the judgment. However, we conclude the trial court did not abuse its discretion in declining to award fees to Ragan. We overrule her twenty-first issue.

## III. CONCLUSION

We modify the trial court's judgment (1) to delete the appointment of a parenting facilitator under family code § 153.6051, (2) to reflect that the parties were named joint managing conservators of Z.J.M.A., and (3) to reflect that Muehlfeld is awarded $7,250 in attorney's fees and expenses. The judgment is affirmed as modified.

DORI CONTRERAS
Chief Justice

Delivered and filed on the
17th day of February, 2022.

28